**SECURITIES AND EXCHANGE COM-MISSION, Plaintiff,**

v.

**CAPITAL COUNSELLORS, INC., et al., Defendants.**

**No. 71 Civ. 1390.**

United States District Court, S. D. New York.

June 11, 1971.

Kevin Thomas Duffy, Regional Admr., New York Regional Office, New York City, for Securities and Exchange Commission, Donald N. Malawsky, Gerald Gordon, Roger M. Deitz, Paul V. Mifsud, New York City, of counsel.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendants, Hobart L. Brinsmade, David J. Mountan, Jr., Myron D. Cohen, New York City, of counsel.

## OPINION

COOPER, District Judge.

Plaintiff Securities and Exchange Commission instituted this action on March 25, 1971 by filing a complaint alleging numerous violations by the corporate and individual defendants of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, and the rules and regulations enacted thereunder (Plaintiff's Complaint, March 25, 1971, pp. 1–2); requesting the issuance of an injunction restraining defendants from participating in any manner in the marketing of securities subject to Section 5 of the Securities Act, and the appointment of a receiver to administer the corporate defendants' assets. (Complaint, pp. 14–23).

Contemporaneously, an order to show cause why a preliminary injunction should not issue, containing a comprehensive temporary restraining order, was entered by this Court. (Plaintiff's Order to Show Cause, Temporary Restraining Order and Affidavits, March 25, 1971). On April 2, 1971 all parties to this litigation consenting, and pending disposition of plaintiff's motion, we entered an order creating an interim arrangement with the goal of allowing defendants to continue operation of certain segments of its business without prejudice to the interests of the investing public involved in the disputed transactions. (Stipulation, Undertaking, and Order Modifying and Extending Temporary Restraining Order, April 2, 1971). That order was amended on April 8, 1971 and provided for substitution of the fiscal agent and designated an independent accountant. On May 7, 1971, an order was entered upon consent of all

parties further modifying the prior court orders so as to provide a more workable interim arrangement. (Order Further Modifying and Supplementing Temporary Restraining Order, May 7, 1971).

Focusing on what we consider to be the threshold and most likely determinative issue of this litigation, the parties were directed to present evidence as to whether participation in defendants' Government Bond Plan constituted an investment contract subject to the registration provisions of the 1933 Act. Pursuant thereto hearings were held May 12, 13, 14, 17, 18, 19, 21, 1971 and on May 26, 1971 we endorsed the motion papers:

> "We have decided to grant plaintiff's application for a preliminary injunction and the appointment of a receiver. The Securities and Exchange Commission is directed to promptly submit on notice complete findings of fact and conclusions of law."

Plaintiff complied June 3, 1971, defendants on June 8, 1971.

Jurisdiction is based on Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b–14.

This opinion constitutes our findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P.

## The parties involved

Capital Counsellors, Inc. ("Counsellors"), a Delaware corporation with offices located at 110 Wall Street, New York, New York, has been registered as a broker-dealer with the Commission since May 12, 1960 (Tr. 548)[1] and a member of the National Association of Securities Dealers, Inc. Counsellors oversees Capital Advisors, Inc. and manages the Atlantic Fund for Investment in U. S. Government Securities, the Government Bond Plan and the Put and Call Program.

Capital Advisors, Inc. ("Advisors"), the alter ego of Counsellors, shares common office space, personnel and telephone service. It has been registered as an investment adviser with the Commission since January 7, 1962. (Tr. 548). Advisors publishes and sells to subscribers a semi-monthly bulletin entitled "Money and Credit Reports," also two books "The Money Squeeze" and "Final Stages of the Money Squeeze."

J. Irving Weiss ("Weiss"), the protagonist in this litigation is a founder, president and director of Counsellors and its subsidiaries, and owns a portion of the equity securities of Counsellors.[2]

Abraham B. Weiss, Weiss' brother, was a vice-president and director of both Counsellors and Advisors and owned a

---

1. "Tr." followed by a page reference relates to the hearing transcript.

2. At the outset of their investigation, the Commission apparently believed, on the basis of the broker-dealer form filed by Counsellors, that stock of the corporate defendants was owned exclusively by the Weiss brothers. Weiss testified at the hearing that after spending over 40 years on the "street" (his first exposure to Wall Street in the summer of 1924 as a typist) (Tr. 545), he thought it was "normal" that a broker-dealer could have a "limited number of investors in a small company" without disclosing to the Commission this distribution of stock. (Tr. 704–5). He maintained this position although admitting that he had completed a broker-dealer registration form for the SEC that requested information concerning stockholders, and that he was aware that any change in either operation or status would require amendment of the form. "Q. Did you put those 14 stockholders [in fact there were "about 20" stockholders in Counsellors, and "about 14" were not members of the Weiss family (Tr. 704)] in an amended registration form? A. I don't recall our doing that." (Tr. 705). Additionally, despite his familiarity with securities practice, he was allegedly unaware that a private placement necessarily involved sophisticated and wealthy investors. (Tr. 565).

percentage of the equity securities of Counsellors.[3]

## The Government Bond Plan

The government bond plan, conceived by the Weiss brothers in February of 1967, combined the trading in government securities, treasury bills and long term government bonds with the anticipated fluctuation in interests to create a scheme for securing substantial profits.

Individuals were solicited to invest $10,000 for a unit "participation" in the plan. Defendants deposited these funds in short term commercial paper until a large enough number of investors enlisted, at which point a two year loan was negotiated by Weiss' efforts for the group.[4] The loan proceeds and cash subscriptions were then combined in what Weiss denominated a "syndicate." Each participant assumed a fraction of the loan in the amount of $91,000,[5] and united with a portion of his initial investment,[6] defendants purchased for his account a 90 day $100,000 face value treasury bill. The treasury bill was immediately pledged as collateral for the loan and deposited in an escrow account. (Tr. 575). Throughout this phase of the plan, each participant suffered a diminution of his equity as the loan's interest exceeded the profit realized from the treasury bill.[7] As treasury bills matured, they were rolled over by defendants.

Weiss predicted in his promotional literature and lectures that in the very near future interest rates would soar; this would create the proper market condition for defendants to advise the participants to transfer their holdings from treasury bills to depressed long term low interest bearing government bonds. Despite the widespread unavailability of credit during this chaotic situation, the earlier margin purchase of treasury bills insured each participant access to $100,000 to subsidize the acquisition of long term bonds. Thus the purchase of treasury bills, even at a net loss to the participant, was an integral part of the bond plan. The newly acquired long term government bonds would be substituted for the treasury bills as collateral for the loan.

3. Although plaintiff initially contemplated calling Abraham Weiss as an adverse witness (Tr. 425), he did not testify at the hearing. The extent of his participation in the operation of the corporate defendants was never clearly established. However, Weiss acknowledged that his brother had "a major part in the start-up of the government bond plan" (Tr. 549), and constantly employed the term "we" to describe Counsellors' management. (e. g. Tr. 551, 556).

4. Originally, defendants secured the borrowing from savings and loan associations; at the request of the SEC, banks were substituted as the source for the loan. (Tr. 736).

5. In 1967, each participant account was debited with a $95,000 obligation; the excess of the participant's investment not expended in the purchase of the $100,000 face value treasury bill was "transferred in the customer's margin account as a credit." (Tr. 757). In April 1968, at the Commission's suggestion, defendants reduced the portion of the loan reflected on each participant's balance sheet to $91,000. (Tr. 767). Under either arrangement, the participant's initial contribution was never fully invested, and the unused portion was applied to the differential between the interest due on the loan and the interest received from the treasury bill. After this balance of the participant's investment was exhausted, Weiss simply increased the amount of the loan to cover the cost of the interest differential. (Tr. 768).

6. $1,000 was immediately deducted from each unit of investment as compensation for defendants' services.

7. Although the investors were aware of this interest differential at this stage of the plan (Tr. 68–9, 492–3), some relied on Weiss' prediction, contained in his Memorandum on United States Government Securities ("Memorandum") (P. Exs. 1, 10, 11A, 22), defendants' primary promotional literature, that "we expect your three month Treasury bills to sail right through your balmy costs so that at a given point your return from Treasury bills will carry the cost from your loan" (Tr. 187), or assurance that the "most you should be paying the first year" is $690. (P.Ex. 19; Tr. 46, 81–2).

Finally, Weiss had forecast a rapid retreat in interest rates which enhanced the value of the long term bonds. The participants were to realize substantial profits when the bonds would be sold after climbing in price in response to falling interest rates.

In all, defendants managed the marketing of some thirty-three (33) syndicates comprising over six hundred (600) public investors (Tr. 606) controlling some seventy (70) million dollars of treasury bills. (Tr. 596). In promoting the bond plan, defendants concededly employed the means and instrumentalities of interstate commerce and of the mails. (Tr. 589).

### Investment Contract

Plaintiff contends that participation in the Government Bond Plan as outlined above and operated by defendants clearly constitutes a security as defined by Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1). Defendants resist this characterization in a two fold argument: (a) an essential element of an investment contract, the expectation of "profits solely from the efforts of the promotor" SEC v. Howey, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1105, 90 L.Ed. 1244 (1946), is absent inasmuch as defendants merely advise the participants at the propitious moment to purchase long term bonds, the profit making phase of the plan (Tr. 953–5) and, (b) a no action letter of November 17, 1967 (P. Ex. 5) was issued by the Commission staff after reviewing with defendants the necessity for registration of the bond plan. (Tr. 956).[8] In disposing of

the position thus advanced by defendants, for purposes of this motion we treat both arguments simultaneously, for we view the presentation of the plan, as relied upon by the Commission and which formed the basis of the no action letter, as not creating an investment contract. However, defendants' deviation in a number of significant respects from this approved design both amply substantiates the presence of each element of an investment contract and pierces the protective shield of the no action letter.

### Deviations from no action letter

#### 1. sophistication of investors

In their initial written correspondence with the Commission, defendants' counsel represented that the "program is designed for sophisticated and wealthy investors able to invest in multiples of $10,000." (P. Ex. 4, September 25, 1967 letter, p. 1). Further, in that same letter, counsel stated that "Counsellors has individually negotiated and contracted with approximately 55 investors to date,[9] and well-to-do and sophisticated enough in money matters to realize the speculative risks, as well as the opportunities," and concluded that "the number and type of investors intended to be attracted thereby are not suitable subjects for regulation." (P. Ex. 4, p. 4). Weiss testified at the hearing that it is "still true" that the participants in the plan are all well-to-do and sophisticated." (Tr. 570, 697).

Although we recognize that the five investors who testified at the hearing were called by the Commission,[10] we

---

8. In 1967, after Capital Counsellors partnership commenced operation of the bond plan, the Commission requested Weiss to confer with their Washington staff as to "possible violation of the registration provisions under the Securities Act." (Tr. 558). As the plan operated at that time, the partnership had the discretion to transfer a participant's bills into bonds. (Tr. 732). After a flurry of conversations, correspondence, and phone calls, defendants successfully sought a no action letter.

9. In their letter of October 3, 1967, to the Commission, defendants emphasized that "In each case, the customer made a personal appointment with one of the Weiss brothers, talked the mechanics of the Program over * * *." (P.Ex. 39, p. 2).

10. In fact, plaintiff conceded that some investors "are certified public accountants and may be attorneys." (Tr. 426). Plaintiff's proposal to offer a schedule of

note that defendants failed to present any investor to counter our impression that by and large the participants in the bond plan did not possess either characteristic. Defendants acknowledged that one, Miss Beissner, could not afford the Government Bond Plan. (Tr. 701).[11] Weiss characterized another investor witness as "sophisticated according to the information he gave me" (Tr. 702). He was referring to Mr. Rudin, a sixty-eight year old part-time window cleaner with a level of formal education equivalent to "something like public school" (Tr. 445–6), who had amassed $60,000 in life savings at the time he entered the bond plan.[12] (Tr. 492) While we found Mr. Rudin extraordinarily alert and possessed of a keen mind, we consider his closing remarks enlightening on his business sophistication and acumen. "I am very confused. I get mixed up with figures and records and I can never remember. I don't remember when was even yesterday, not even." (Tr. 497).

These witnesses were apparently representative of the larger number of participants in the bond plan.[13] (Tr. 697–700). As to the "customer [having] a personal appointment with one of the Weiss brothers" (P. Ex. 39, p. 2), Weiss testified that this representation was no longer true, and further, that defendants never advised the Commission in writing that they no longer intended to personally confer with every prospective investor.[14] (Tr. 605).

### 2. management of government securities

We view defendants' repeated representation that investors would have "the power to control the purchase and sale of the U. S. Government securities in the escrow account and thus the sole responsibility for management decision" (P. Ex. 4, September 25, 1967 letter, p. 3) as the critical factor leading to the Commission's issuance of the no action letter. (Tr. 889–92). We conclude that the participant in the bond plan, as operated by defendants, did not exercise "sole discretion" of management decision. (P. Ex. 5).

---

the investors was commendable (Tr. 426); however, no such document was introduced into evidence by either side.

11. When questioned as to how witness Beissner was accepted as a participant, Weiss offered an unsatisfactory explanation that "she never asked me whether this was in line with her resources." (Tr. 701). Further, Weiss admitted that their promotional literature did not suggest a minimum level of resources as a prerequisite for safe participation in the plan. (Tr. 702). In later testimony, Weiss sought to change his testimony and stated that "At the time [of investment] I assumed" she was a sophisticated investor. When pressed as to the basis of this assumption, Weiss failed to offer credible evidence to support his conclusion. (Tr. 712–14).

12. Witness Rudin testified that he accurately informed Weiss of his financial position prior to his entry into the plan. (Tr. 494–5).

13. Witness Horigan, before participating in the bond plan, in a letter to one of

defendants' employees, Bush, director of marketing, (Tr. 609), volunteered information as to his financial status (Tr. 143–5): "I am 80 years old and my income is dividends and interest on what funds we have. To go into your plan I will have to dispose of some of our holdings and sacrifice the income (with the hope of later making a capital gain, of course). So it will be a little time until I can get things lined up to go along with you, but hope to do so eventually." (P. Ex. 23). Other investors were less candid in depicting their financial status. (Tr. 344–70).

14. In fact, of the 650 investors, the Weiss' personally spoke with only 200. (Tr. 606). Weiss, in a vague response maintained as to the other 450, "Either we spoke to them or our representatives, people in our organization talked to them, or we talked to them at seminars." (Tr. 607). Witness Beissner never spoke with anyone at Counsellors (Tr. 12), and apparently neither did witness Horigan (Tr. 180–1).

## 2a. rollover of treasury bills

In the initial holding phase of the program, defendants purchased three (3) month $100,000 face value treasury bills on behalf of each unit participant; concededly,[15] as these treasury bills matured, reinvested the proceeds in similar treasury bills (rolling over) without contacting the participant or seeking his consent. (Tr. 555–7). This unilateral rolling over of treasury bills was contrary to the representations of defendants before the Commission, and accordingly inconsistent with the program as approved by the SEC in the no action letter.

The unequivocal language consistently appearing in defendants' correspondence,[16] clearly anticipates the individual participant's continuous administration over all phases of the plan—investor control of both treasury bills and long term government bonds.

In the letter of September 25, 1967, immediately after describing the assignment of a portion of the collateralized loan to the newly inducted syndicalist, defendants' counsel stated:

> *This effectively transfers to each investor the right to designate how and when U. S. Government securities placed in the bank escrow account are to be bought and sold.*[17]

[emphasis in original]

\* \* \* \* \* \*

Advisors then suggests from time to time to each investor how he ought to purchase and sell the Government securities in his escrow account. (P. Ex. 4, September 25, 1967 letter, pp. 2–3).

Defendants' counsel in the third letter of the trilogy stated:

> "Each customer, as before, would have the obligation to pay the bank loan rate on that portion taken by him only, and would have the sole discretion subject to the bank's right to call for more collateral to buy and sell the securities pledged on that portion taken by him." (P.Ex. 40, p. 2).

The no action letter, confirms what we conclude was the understanding reached between the parties: that upon allocation of the secured loan,

> "Each customer would have the obligation to pay the bank loan rate on that portion allocated to him and would have the sole discretion subject to the banks right to call for more collateral, to buy and sell the securities pledged on that portion taken by him." (P. Ex. 5),

and that this discretion necessarily included investment decisions over pledged treasury bills as well as long term bonds.[18]

We find unconvincing defendants' arguments that this apparently unambiguous language was in fact understood by the Commission as permitting defendants to exercise unilateral control over the purchase of treasury bills for customers' accounts. (Tr. 956). Although defend-

---

15. Each investor was informed that defendants were rolling over treasury bills held in his account (e. g. Tr. 47–50). Defendants' promotional literature, the Memorandum in more recent editions specifically recited that "We roll over the Treasury Bills for you which you own" (P.Ex. 11 A, p. 8). Of significance, the Memorandum submitted by defendants for review by the Commission did not include such a reference. (P.Ex. 10; Tr. 649).

16. These letters must be read in the context of what we find to be an endeavor by defendants to convince the Commission that a participation in the program did not constitute a security. (Tr. 871).

17. In our reading of this language and from the entire letter, we cannot find any indication or suggestion that this transfer of control over the pledged securities is not accomplished simultaneously with the participant's assumption of the loan.

18. Throughout the correspondence, defendants never limited the purported area of customer discretion specifically to long term bonds, but chose the term "Government securities" which by definition includes treasury bills and long term bonds (Tr. 866, 872–4).

ants admit that the specific term "roll over" never appeared in any literature or correspondence sent to the Commission (Tr. 576, 659), they contend that one piece of literature [an edition of the memorandum] accompanying two of the letters clearly reveals defendants' intention to roll over treasury bills. The Memorandum, exhibit D, to defendants' letter of October 3, 1967, in describing the plan's operation recites:

"Only short term U. S. Treasury Bills will be purchased at this time, in preparation for Capital gains investment in long term Government Bonds * * *.

In anticipation of a rise in interest rates, we will continue to own only U. S. Treasury Bills * * *.

You will be notified when it is time to switch to long term bonds selling at lower prices." (P.Ex. 34, ex. D, p. 6)

Likewise, an identical Memorandum was attached to defendants' letter of October 31, 1967. (P.Ex. 40, ex. C, p. 6).

We cannot accept Weiss' testimony that this language "meant" that Counsellors would be rolling over treasury bills. (Tr. 743). The Memorandum's wording, when viewed in context of the letters to which they were attached as exhibits, cannot be reasonably interpreted as in any way varying the apparent representation contained in the letters that customers would control the transfer of all the pledged securities.[19] In fact, witness Chalmers, the attorney most closely associated with defendants in obtaining the no action letter, testi-

fied that this language "didn't imply anything one way or another, in my estimation" with respect to the rolling over of treasury bills. (Tr. 835–7).

Defendants contend that in the course of describing the operation of the bond plan during the September 20 and 29, 1967 Washington meetings,[20] the SEC was specifically informed that one feature of the program was the unilateral roll over of treasury bills by Counsellors, (Tr. 576, 735–8); and that the SEC failed to register any objection to this aspect, but rather "in all conversations on the government bond plan * * * the assumption was taken that we were to roll over the treasury bills." (Tr. 626, 739).[21] We find this portion of the testimony particularly hollow.

In essence, defendants ask us to read the wording of the correspondence as relating exclusively to what they consider the central issue then in dispute, ("the crux of our whole operation" (Tr. 751)) the placing of participants into long-term government bonds—that defendants' representations extended only toward insuring the participant sole discretion in the decision to switch from short term treasury bills to long term government bonds.

We find defendants' testimony unconvincing; we cannot construe the term "government securities," as used in the exchange of letters, to refer only to long-term bonds. (Tr. 633–4, 749). Weiss personally aided in the preparation of letters subsequent to these alleged statements, and never suggested substituting

---

19. Weiss also considered the statement appearing in the Memorandum that "when the decision is made to switch from short term United States treasury bills to the purchase of long term Government securities * * * you will be so advised.", as implying that no such advice would be offered as to treasury bills and accordingly disclosure had been made of the roll over feature. (Tr. 656–8). Our opinion expressed above, is equally applicable here.

20. Most particularly in a telephone conversation from the hall of the Commis-

sion building on September 29, 1967. (Tr. 627–8).

21. Exhibit 38 reveals and both sides concede, that the subject of what would be done with treasury bills as they matured was discussed; however, it is unenlightening on the critical issue as to who would manage the reinvestment. (Tr. 635). Likewise, the Commission's silence in May of 1970, in the course of an investigation into Counsellors' activities, is not evidence of their affirming defendant's right to roll over bills. (Tr. 770–3).

"bonds" for the word "securities," or correcting the impression that treasury bills were included within that term. (Tr. 563, 581–3). Further, defendants' contention that the purchase of "treasury bills represented no risk [to the subscribers] and [needed] no particular know how in doing these things. But just to keep cash." (Tr. 739, 645) is inapplicable to the bond plan arrangement where bills were purchased on margin and the resulting interest differential (which could continue for 2 years) substantially eroded the participant's investment.[22] (Tr. 684–5). Even assuming a non-leverage situation, the rolling over of treasury bills is not a simple ministerial act, but involves a choice as to maturity date (Tr. 577), which in turn, affects the return from the bill (Tr. 791–4)—in all, a selection from a variety of "60 or so" treasury bills. (Tr. 578).

Witness Chalmers was unable to "recall in detail" the description of the bond plan presented to the Commission's Washington staff, but recollected that the "essential features of the plan" were discussed. (Tr. 820). However, he did testify that "as far as [he] could recall" there was no objection voiced by the Commission to Counsellors rolling over the treasury bills (Tr. 827); that the only objection raised as to customer discretion related to the placing of the participant's investment into bonds. (Tr. 826–7). Although Chalmers acknowledged knowing that treasury bills were to be "rolled over without consultation with the participants" (Tr. 850), he was unable to offer a satisfactory explanation for the repeated choice of the term "U. S. Government securities" in describing the scope of customer discretion. (Tr. 880–

88, 893–94). Further, Chalmers testified that on one occasion, the September 25th letter (P.Ex. 4, p. 2), the term "U. S. Government securities" included "all such Government securities," both bills and bonds. (Tr. 877).

Neither the testimony of Chalmers nor Weiss convinces us that we should disregard the plain meaning of the correspondence and interpret as the understanding of the parties that customer discretion first came into effect at the bond phase of the plan. To regard the term "U. S. Government securities," unambiguously appearing in correspondence between attorneys with extensive securities law expertise, as excluding treasury bills would require our creating a tortured definition[23] unsupported by the credible evidence before us.

*2b. purchase of long term government bonds*

Even assuming defendants successfully established that the rolling over of treasury bills was within the purview of the no action letter, and that such activity was simply a ministerial chore and not investment management, defendants overstepped the boundaries delineated for their participation in the projected second phase of the bond plan.

It is uncontested that the bond program, as described in conversations and correspondence (Tr. 627–8, 643) and presumably as operated by defendants (Tr. 647), envisaged the participant having "sole discretion to buy and sell the securities pledged on that portion taken by him." (P.Ex. 39, p. 2). Defendants' role was restricted to "In particular, Advisors would alert the investor to the favorable condition for purchases in a depressed long-term U. S. Government

---

22. Throughout the operation of the bond plan participants' funds were only invested in treasury bills. Due to the cost of supporting the loans, of the original total investment of 6½ million dollars, some 2½ million dollars was lost. (Tr. 717). We cannot agree with Weiss that the only risk, in the plan arose when participants' funds were transferred into long term government bonds. (Tr. 749A).

23. Weiss definitions at trial: "Customers of Capital Counsellors" was defined as "anyone who buys anything from our organization." (Tr. 590). This definition would embrace 190,000 purchasers of "The Money Squeeze" and "The Final Stages of the Money Squeeze." (Tr. 592A). "Potential" meant the "possible profit," and did not include possible loss. (Tr. 713–5).

securities market when that favorable condition comes into existence." (P.Ex. 40, p. 2).

As part of the unconvincing September 29th phone call, Weiss allegedly requested further clarification as to whether defendants could acquire a power of attorney to purchase long term bonds on behalf of the participants.

"And [sic] I to understand from the conversations we have had today that we can get a power of attorney from the customer to buy long term bonds?[24] And Mr. Sporkin said emphatically not." (Tr. 627–8).

Undeterred, Weiss, admittedly, in June 1970, requested and received permission from participants to transfer assets from treasury bills to long term loans as to 40% of the unit investment.[25] (D.Ex.B, F, Tr. 639). The blanket authorization did not provide for a fixed date by which the transfer was to be accomplished, or in any way inhibit defendants' unfettered choice as to what bond to select. (Tr. 639). The fact that this authorization was never implemented is of slight significance. (Tr. 640).

Despite the Commission's clear warning to the contrary, and Weiss' conceded representation that as to this aspect of the bond plan the participant would exercise sole discretion, Weiss admitted that "We obtained their discretion * * *. We had it." (Tr. 640). Miss Beissner's sole discretion was transformed to defendants by their "shar[ing] some of that discretion with her." (Tr. 654).

*3. broker dealer—investment contract*

In the letter of October 3, 1967, defendants' counsel sought to characterize the Government Bond Plan as equivalent to an ordinary broker's account and to distinguish the program from what traditionally would be considered as constituting a security.

"I think we were in accord that the services rendered by Capital Counsellors in securing credit for the purchase of U. S. Government securities by customers and the services rendered by Capital Advisors, Inc. in suggesting to customers how to manage their accounts did not add up to the type of activity generally regarded as separating management from ownership and creating a 'security.' A 'security' is created when a customer turns over his money to Atlantic Fund for Investment in U. S. Government Securities, Inc. In that case, Advisors puts in the buy and sell orders and has overriding discretion as to how and when the underlying securities are to be sold. The Government Securities Program however, works like an ordinary broker's account. The customer puts in the buy and sell orders, accepting or disregarding the broker's advice. The only distinction between an ordinary broker's account and the Government Securities Program is that in the latter case, the securities involved are pledged with a bank for the account of a savings and loan institution, instead of pledged with a broker for the account of the bank putting up the money. In both cases, the broker goes out and arranges the credit for a group of his customers. In both cases, it is the customers who control the disposition of the pledged securities and who bear the ultimate responsibility for interest and principal payments." (P.Ex. 39, p. 4).

On the basis of the evidence before us, the bond plan participation was strikingly dissimilar to the traditional broker-customer relationship; in fact it created an investment contract.

Weiss admitted in the course of his testimony that the analogy was somewhat inaccurate (Tr. 678); the plan in

---

24. We view this statement as manifesting the manner in which Weiss anticipated operating the bond plan.

25. Defendants accepted a formal power of attorney from investor Levine (P.Ex. 37, Tr. 504), a well-traveled "free soul" who spent much of his time "out of town."

"many respects" operated like an ordinary broker's account "except for rolling over the treasury bills." (Tr. 610). Despite what Weiss considered a significant variation, defendants were content to employ the broad term "securities" in describing the scope of customer discretion and omit this distinction in the contrast drawn in the October 3rd letter. In rolling over treasury bills, unlike the usual broker's account, the investor was never consulted (Tr. 617), nor did defendants promptly send a confirmation of sale. (Tr. 618).

Additionally, Weiss conceded that in an ordinary margin account, the investor "is locked in" only "Until he wants to get out." (Tr. 620). As the bond plan operated, each investor was in fact "locked in" to participate in the program for two years. (Tr. 620-4).

Counsellors' financial arrangement with the customer as to the amount of the loan to be assumed by each unit participant and secured by the pledge of the treasury bills, whether approved by the Commission or otherwise, was significantly dissimilar from the standard broker account. Defendants borrowed "on customers' securities more than is owing to them" (Tr. 676), and "borrow[ed] on customers' securities without informing them that their securities were going to be borrowed against." (Tr. 678).

Defendants, in their letter of September 25th, sought to delineate the "limited" benefits of the bond plan to the subscribing customer.

"The investor is given two things and two things alone * * * (1) the opportunity to obtain money for the purchase of U.S. Government securities at a more favorable rate than that generally available and (2) investment advisory services in deciding how and when to buy and sell these securities." (P.Ex. 4, p. 2).

In fact, defendants offered the public an opportunity to invest money in a common enterprise with the expectation that they would earn large profits solely through defendants' efforts. "Form was to be disregarded for substance and emphasis was placed upon economic reality." SEC v. Howey, *supra,* at 298, 66 S. Ct. 1100, at 1102. The subscriber had no active role in the management of his participation. Shortly after receipt of his investment, he was, often unknowingly (Tr. 43, 163, 458-62), locked into a sizable two year loan commitment and took no part in the purchase and roll over of treasury bills credited to his account and pledged as security for his loan. Few, if any, participants had any prior experience either with government securities other than E bonds (Tr. 42-3, 303, 464) or a sophisticated leverage investment. (Tr. 60, 178, 277, 489-90). Participants never saw the underlying loan agreement (Tr. 125) or treasury bill (Tr. 176-176A). Investor Rudin never even realized that he had assumed a loan; he thought that defendants borrowed money on his behalf and he was obligated to pay the interest as part of the cost of participation. (Tr. 456-7). Mr. Murdzak echoed this sentiment, and when confronted with the contract he signed (D.Ex. O) expressly reciting that he was "taking a portion of a loan," responded, "I felt it was just a paper that I had to sign in order to get into the bond plan." (Tr. 309). Many, if not all, participants relied exclusively on Weiss' expertise [26] of trading in treasury bills and long term bonds (Tr. 112-3, 129-31, 184), and realization of profits.[27] (Tr. 23, 152, 453-4). Miss Beissner testified:

"A. I was paying them to take care of my money.

---

26. Although Weiss testified that he "never considered myself to be an expert in anything," in response to the question, "Did your literature ever claim any expertise for you in Government securities?" he answered, "I assume it did." Weiss authored this promotional literature (Tr. 552).

27. Separation of investment from control appears undeniable when in 1970, unknown to participants, some syndicates were closed because Weiss was unable to obtain loans (Tr. 720), of course, this precluded the purchase of treasury bills on margin. (Tr. 720).

Q. How much were you paying, them, Miss Beissner?

A. I gave them a fee of $1,000.

Q. What was your understanding of what that fee was supposed to be for?

A. The fee was supposed to cover buying the Treasury bills until the bonds were low enough to buy, and then later disposing of the bonds and—well closing out the whole project.

Q. Were you supposed to do anything, Miss Beissner, in connection with this plan?

A. No. The $1,000 fee was supposed to have been the entire fee that it would cost me for their part in taking care of my plan."

(Tr. 50-49, 130-1). (Transcript misnumbered).

Mr. Rudin testified:

"I followed a hundred percent their advice." (Tr. 464).

No evidence was adduced at trial that a single participant refused to consent to Weiss' "invasion" of his discretion or failed to authorize defendants' indiscriminate purchase of long term bonds for his account. Neither was there any evidence that in the three (3) years that the plan functioned, a single participant independently contacted defendants and gave instructions to transfer his funds to long-term bonds. If defendants are correct in summarizing the failure of the bond plan with "the market was missed" (Tr. 962) by Weiss, each and every investor in the Government Bond Plan shared the misfortune attendant that misjudgment in timing.

"The Witness: I asked Mr. Weiss if he thought that by us giving him our savings he could do a better job with them than we could.

Q. Did Mr. Weiss reply to you?

A. Mr. Weiss said that he has been in this business for a long time and he felt that he was more competent at doing the right thing with our money than we would be." (Tr. 270).

### § 10(b) and § 17(a) Fraud

Defendants' widespread promotional literature and correspondence were replete with false and misleading statements omitting or concealing the substantial risks a participant undertook in subscribing to the bond plan.

Induced by claims of 3 to 1 profits (Tr. 685), prospective investors were never alerted to the fact that defendants projections as to fluctuation in interest rates and trading prices of government securities were speculative and subject to human error (Tr. 690), that in fact such an error had occurred (Tr. 723-5), and a miscalculation could endanger their entire investment. (Tr. 684-5, 713-5). Although most participants were concerned with preserving assets (Tr. 181), defendants failed to adequately explain the dangers inherent in purchasing on margin. (Tr. 152).

Defendants' promotional "literature" by reciting that the investor "retains final control of the buy and sell decisions because you own the securities" misled investors into believing that they retained the option of withdrawing from the program. (Tr. 163, 462). Weiss confessed at trial that "some investors [were] told that they could cancel at will when they made their investment * * some of these same investors [were] informed later that they could not cancel at will." (Tr. 708-9). Defendants occasionally permitted the withdrawal of a participant if a replacement was available to assume the departing investor's position. (Tr. 708). Defendants did not regard it necessary to inform the substitute that he was replacing a withdrawing subscriber; on at least one occasion, an individual was assigned to an existing syndicate as a replacement without being informed that, due to an intervening change in interest rates, his interest differential would be less if he were treated as a new subscriber to be placed in the most recent syndicate. (Tr. 709-11).

Over the past years, defendants' solicitation and correspondence foretold that

the switch from bills to bonds was imminent. However, defendants failed to disclose to investors that they had been predicting this occurrence over a substantial period of time. (P.Ex. 44).

Defendants did disclose that while awaiting the purchase of long term bonds the interest differential would result in a net loss during the initial stage in the plan. However, in their Memorandum, defendants estimated a present net annual cost at $1,075. Although Weiss told investors that he did not expect the differential to rise above 2%, undisclosed to subscribers was the fact that bill yields were steadily declining to less than 4% as interest rates of over 9% were required on loans in force. (Tr. 684). Under this circumstance, the annual cost of a participation would reach nearly 50% of the individual's investment.

Subscribers were led *to believe that their $10,000 investment would complete their obligation for a unit participation in the bond plan. (Tr. 44). Defendants never advised investors that under the terms of some loan agreements, the margin requirement would be increased as bonds were substituted as collateral. (Tr. 604). If the investor were unable to supply these additional funds, he endangered the costly liquidity position he maintained during the first phase of the bond plan.

During the tight money market in January and February 1970, three syndicates were closed because defendants were unsuccessful in replacing expiring loans. Despite the critical feature of the leverage provided by these loans to the overall success of the bond plan, the affected investors were not immediately notified, and subsequent investors were never informed of, this episode or its potential reoccurrence. (Tr. 720–22).

Finally, investors were informed that $9,000 of their investment would be expended for the purchase of a $100,000 treasury bill and that the $91,000 balance would be the portion of the syndicate loan each would assume. (Ex. 1, p. 8). Participants were never informed that in fact treasury bills were purchased at a discount (Tr. 669), and if the full $9,000 was allotted to the purchase only $89,000 would need to be borrowed. (Tr. 672). Further, Weiss testified that unknown to investors this $2,000 surplus [28] was deposited in banks and any interest earned was credited to Counsellors' account.[29] (Tr. 663–76).

*Disposition*

■ At this juncture of the litigation, this Court need not reach a final determination on the merits of the contro-

---

28. Even assuming that this aspect of defendants' operation was approved by the Commission, recognizing that some portion of the investment would necessarily be maintained as free funds to pay the interest differential, investors were never accurately informed as to this procedure. (Tr. 668).

29. The evasive nature of Weiss' responses to questioning on this aspect was quite characteristic of his entire testimony.
"Q. * * * [W]hat happened to the $2,000 additional that was borrowed. A. It was kept in the bank. Q. Was it earning any interests? A. At given times, no. Q. At other times, was it? A. At some times it was." (Tr. 673).
When Weiss was questioned as to defendants' role in filling out questionnaires

sent to participants by the SEC, the following colloquy occurred:
"Q. When did you first see it? A. One of our clients came in with it or sent it to us and asked us to help him fill it out. Q. Did you fill out some of those things in blank yourself. A. There were one or two where we helped to fill out. Q. When you say you helped, did you stand over their shoulders while the investors filled them out? A. I think there were one or two that we assisted that way. Q. Were there others that were assisted in a different manner? A. There may have been.
 * * * * *
Q. Did you suggest to the investors that they send it in to you? A. No sir, I did not. Q. Did someone at Capital Counsellors suggest that? A. I believe so. If they needed help."

versy, but merely resolve whether plaintiff has satisfied its burden of establishing "a proper showing" of need for injunctive relief. SEC v. Boren, 283 F. 2d 312 (2d Cir. 1960); SEC v. Broadwall Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y.1965). It has done exactly that. On the basis of the papers before us and the total hearing record, we conclude that under either statutory or common law standard, the Commission has squarely fulfilled its undertaking. Accordingly, its application for a preliminary injunction is granted.

 From on or about January 1968, the defendants singly and in concert participated in the offer and sale of unregistered securities, as defined by Section 2(1) of the Securities Act, consisting of investment contracts in the defendants' Government Bond Plan. SEC v. Howey, *supra;* SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

In the offer and sale of the Government Bond Plan: (a) persons invested money in a common enterprise and were led to expect profits solely from the efforts of the defendants, (b) persons invested in it because of economic inducements, (c) defendants provided management services, (d) the economic welfare of investors was inextricably woven with the ability of defendants to carry out this common enterprise for the benefit of those whose investments were solicited.

In the course of this sale of securities defendants: (a) failed to truthfully inform investors of the true costs and substantial risks of the Government Bond Plan, SEC v. Van Horn, 371 F.2d 181 (7th Cir. 1966); Hughes v. SEC, 85 U.S.App.D.C. 56, 174 F.2d 969 (1949), (b) failed to deal fairly and honestly with their customers in the operation of the Government Bond Plan.

To prevent "diversion or waste of assets to the detriment of those for whose benefit, in some measure, this injunctive action is brought" SEC v. H. S. Simmons & Co., 190 F.Supp. 432 (S.D.N.Y. 1961), we consider it imperative to grant plaintiff's application for appointment of a receiver.[30] Bellevue Gardens, Inc. v. Hill, 111 U.S.App.D.C. 343, 297 F.2d 185 (1961); Bailey v. Proctor, 160 F.2d 78 (1st Cir.) cert. denied, 331 U.S. 844, 67 S.Ct. 1515, 91 L.Ed. 1847 (1947). Sydney B. Wertheimer, Esq., 1501 Broadway, New York, New York is hereby appointed receiver.

Settle order promptly on notice.

---

30. We are constrained to note that defendants failed to observe the restrictions contained in the outstanding temporary restraining order and interim arrangement pending determination of this application. (Tr. 694–7).