572 F.2d 894
 1 Employee Benefits Ca 1573
 F. Ray MARSHALL, Secretary of Labor, Plaintiff-Appellee,
v.
George SNYDER, Irving Rosenzweig, Anthony Calagna, Clarence
Clarke, James Isola, William Snyder, Joseph Grippo, Benjamin
Petcove, General Teamsters Industrial Employees Local 806,
806 Record Processors, Inc., Defendants-Appellants.
 Nos. 88-90, Dockets 77-6078, 77-6081, 77-6083.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1977.
Decided Feb. 17, 1978.
 
 1
 Mary S. Calfee, Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Steven J. Sacher, Monica Gallagher, Sherwin Kaplan, Plan Benefits Sec. Div., Washington, D. C., and Francis V. La Ruffa, Regional Sol., U. S. Dept. of Labor, New York City, of counsel), for Secretary, appellee.
 
 
 2
 Mark Lemle Amsterdam, New York City (Rubin, Hanley & Amsterdam, New York City, of counsel), for appellants General Teamsters Industrial Emp. Local 806 and 806 Record Processors, Inc.
 
 
 3
 Michael Lesch, New York City (Shea, Gould, Climenko & Casey and Arthur D. Felsenfeld, New York City, of counsel), for appellants Calagna, Clarke, Grippo, Isola, Petcove and William Snyder.
 
 
 4
 Charles F. Murphy, New York City (Murphy & Maviglia, New York City, of counsel), for appellants George Snyder and Rosenzweig.
 
 
 5
 Before MANSFIELD and TIMBERS, Circuit Judges, and DOOLING, District Judge.*
 
 
 6
 DOOLING, District Judge.
 
 
 7
 The Secretary of Labor commenced the present action on January 20, 1977, under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, et seq., against certain present and former trustees of three employee benefit plans of General Teamsters Industrial Employees Local 806, against Local 806, and against 806 Record Processors, Inc., a corporation all of the outstanding stock of which is owned by one of three employee benefit plans, Local 806 Teamsters Health and Welfare Fund. The charge of the complaint is that the present and former employee benefit plan trustees have permitted and are permitting the expenditure of unwarranted sums of money from the plan assets, including (a) making payments totalling about $1,000,000 to defendant trustee George Snyder (allegedly an amount far in excess of reasonable compensation for any services he actually rendered); (b) expending about $380,000 to refurbish office quarters for the Union and for the Welfare, Annuity and Pension Plans, in violation of the fiduciary duties imposed by 29 U.S.C. § 1104(a)(1)(A) and (B); and (c) by transferring $300,000 of Welfare Plan assets to defendant 806 Record Processors, Inc., ("RPI") in exchange for all of its stock, and then causing RPI to lend $290,000 to Local 806. The complaint prayed for an order removing from fiduciary office each defendant presently serving as a trustee and enjoining each individual defendant from further serving as a fiduciary of any of the employee benefit plans or of any other employee benefit plan for at least five years; the court was asked to supervise the installation of successor trustees independent of the present defendants for each of the three plans, meanwhile appointing an interim receiver to assume the duties of the defendant trustees pendente lite ; the complaint further prayed for the rescission of the transactions by which assets of the Welfare Plan were transferred to RPI, for the dissolution of RPI, and an accounting of its assets, and for a judgment against defendants for restitution, including lost profits, of all amounts paid in connection with the matters alleged on and after January 1, 1975 from the Welfare or Pension Plan assets to the extent that they exceeded the reasonable expense of administering the plans.
 
 
 8
 On February 4, 1977, the defendants consented, by stipulation with the Secretary, but without admitting any allegations of the complaint, to an order, effective during the pendency of the action and until further order of court that the defendant trustees of the Welfare Fund, Pension Fund, and Annuity Fund should neither make nor permit to be made any direct or indirect payments for any purpose from the assets of the funds to defendant George Snyder or to any other individual defendant, to Local 806, or for the benefit of any of said defendants; the order further provided that defendant RPI should not make nor permit to be made any direct or indirect payments for any purpose from its assets to defendant George Snyder, to any other individual defendant, to defendant Local 806 or for the benefit of any of the named defendants
 
 
 9
 "with the only exception that 806 Record Processors, Inc. may continue to make salary payments for services actually rendered to defendants Clarence Clarke, Anthony Calagna, James Isola and William Snyder in amounts not exceeding the following:
 
 
 10
 Maximum
 Per
 Week
Anthony Calagna $750
Clarence Clarke $300
James Isola $825
William Snyder $600"
 
 
 11
 The order further provided that the books of the funds and of RPI should be made available for inspection and copying to the Secretary's attorneys or agents during normal business hours on one day's notice.
 
 
 12
 On April 8, 1977, the Secretary moved by Order to Show Cause to punish certain of the defendants for contempt and for the appointment of a receiver to assume full direction and control of the operations and expenditures of the Local 806 Welfare, Pension and Annuity Plans and of RPI, and for further relief with respect to discovery and inspection of the records of the defendant entities. After a full evidentiary hearing Judge Pratt granted the Secretary's motion to the extent of enjoining all defendants pendente lite from making or permitting to be made any payments by RPI or any of the employee benefit plans to defendants Calagna, Isola, William Snyder or Clarke, and appointed a receiver of the Welfare, Pension and Annuity Funds and of RPI pending final determination of the action. A detailed receivership order was entered later which vested the receiver with legal title to and exclusive possession and control of all of the assets and property of the three employee benefit plans and of RPI, in trust nevertheless for the participants and beneficiaries of the three plans. The receiver was specifically empowered, in ultimate substance, to conduct the affairs of the employee benefit plans and of RPI; the defendants and their agents were enjoined from dealing in any way with the assets, records or property of any of the employee benefit plans or of RPI, and were enjoined from interfering with the receiver's administration in any way. The receiver was directed to undertake a review of the manner of administering the plans and RPI in order to determine generally what changes if any in administration were necessary to the lawful and orderly operation of the plans and of RPI under his receivership, and to report to the Court any proposed changes as well as a proposal for the future administration of the plans and of RPI. The orders were based on very full findings of fact which are amply supported in the evidentiary record.
 
 
 13
 While, as Judge Pratt recognized, the relief that he granted was drastic, the evidence inescapably led Judge Pratt to his conclusion (430 F.Supp. at 1232) that, "The inherent conflict of interest and potential for self-dealing which result from the union officers' controlling both the Plans and RPI, which is the administrative agent of the Plans, coupled with the actual conduct of the defendants since the consent order, and when interpreted in the light of the serious charges of misappropriation of trust fund monies alleged in the complaint, require immediate and drastic action by the court in order to preserve from further dissipation the assets of the Plans for the benefit of their participants and beneficiaries." The orders appealed from must therefore be affirmed. It may be that, inasmuch as the trustees of the Plans are defendants in the action, effective relief can be granted without joinder of the three plans as parties to the proceeding. The plans, however, are clearly proper if not indispensable parties to the proceeding, and it would appear that if, as may be unavoidable, the Secretary will press for very broad relief affecting many aspects of the three plans and their administration, they should be joined as proper parties defendant which may later become necessary parties. Joinder of the plans as parties will provide assurance that complete relief can be accorded among those already parties, and including the plans themselves, as Rule 19(a) of the Rules of Civil Procedure contemplates, and it is clear, of course, that the plans may properly be joined under Rule 20(a) in any case, even though they may not be interested in obtaining or in defending against all of the relief demanded.
 
 
 14
 It is not necessary to review the facts in detail. Local 806 had approximately 2,162 dues paying members in 120 shops of 102 employers. The dues income of Local 806 was about $350,000 a year. There were 2,040 members of Local 806 who were participants in the Welfare Fund, and it has been estimated that there could be as many as 10,000 potential beneficiaries of the Welfare Fund. The Welfare Fund receives about $1,000,000 a year in employer contributions. The Pension and Retirement Fund (hereafter the Pension Fund) covered 1,032 members, and receives approximately $300,000 a year in employer contributions. The Annuity Fund receives about $75,000 a year of such contributions. Claims processed for the Welfare Fund approximate 200 to 300 a month, and there are 74 pensioners.
 
 
 15
 For its services in administering the three plans RPI received about $300,000 a year, $25,000 a month, from the Welfare Plan, and received two or three thousand dollars a month from the Pension Fund. The record is clear that only one RPI employee worked exclusively on Plan matters, an experienced medical claims examiner, who received $2,000 for her work from February 7 to April 19, 1977, a period during which, for example, Calagna, Isola and Snyder were paid from three times to five times as much as the claims examiner, and a period in which Clarke was paid $3,600. In addition there were four clerks on the office payroll of RPI, and there had been one other clerical employee. None of the four clerks devoted full time to RPI's work for the three plans; all did an indeterminate amount of work for Local 806, although they were paid nothing by Local 806. There was in addition a man on the payroll of RPI who appears not to have rendered any service to it, but to have acted as chauffeur for defendant George Snyder.
 
 
 16
 Constance Mavroson was employed by Local 806; paid wholly by Local 806, she acted as officer manager and bookkeeper for all five organizations, the Local, the three plans, and RPI. The testimony of the medical claims examiner and the office manager demonstrates that they and their clerical assistants were in responsible charge of the administration of the three plans so far as concerned all matters internal to the office, such as following collections, processing claims, and effecting disbursements. While the clerical employees received all their compensation from RPI, the evidence of the office manager indicates that they did work on the affairs of the Local as well as work on the various plans. The Local paid salaries only to Constance Mavroson ($320 a week) George Arth ($125 a month), Rosario Albany ($125 a month), and James Kant ($400 a month as back-pay compensation).
 
 
 17
 Neither William Snyder nor Calagna nor Isola nor Clarke received any compensation from Local 806. William Snyder is a trustee of the Annuity Plan, a member of the executive board of Local 806 and its recording secretary. Calagna is president and one of the three directors of RPI and president of Local 806, as well as a member of its executive board. Isola is a member of the executive board of Local 806 and its vice president. Clarke is a trustee of the Pension Plan. These four men received all of their compensation from RPI. Between February 7th and April 19th, 1977, Calagna received $6600, $5100 as salary and $1500 as expenses. In the same period Isola received $10,875, $9,225 as salary and $1650 as expenses. William Snyder over the same period received $6,150, $4500 as salary and $1650 as expenses. Clarke over the same period received $3600, $2100 as salary and $1500 as expenses. In the case of all four men the expense amounts were exactly $150 in each pay period.
 
 
 18
 Messrs. Snyder, Calagna, Isola and Clarke testified; a herculean testimonial effort was made to give an appearance of substance to the routine field work which they did for RPI. The effort failed. The "field" work was a modest informational service performed incidentally to regular trips as representatives of Local 806 to the various shops on union business. The "field" work for RPI, moreover, did not approach the kind of service which could justify the compensation paid the four men; plainly Calagna, Isola and William Snyder, received compensation on an executive scale. The compensation of Calagna, Isola and William Snyder, at various dates between February and April 1977, ranged between an annual rate of $42,900 a year and an annual rate (in the latter part of Isola's weeks) of $27,300. Clarke was being paid at the rate of $15,600 a year. Finally, the testimony is clear that the four men worked on Union matters as well. The testimony affords no means for comparing the value of what was done for RPI with the value of what was done for Local 806 as a labor organization. However, it is evident that whatever union representation and service was rendered to the shops which the four men served was rendered to those shops by these men; there is no evidence that any of the union representation and service to those shops was rendered to any degree by any other personnel of Local 806.
 
 
 19
 The evidence discloses confusion between the duties performed as field representatives of RPI and those performed in regular labor matters as representatives of Local 806. For instance, when William Snyder was asked whether he had said earlier in the testimony that the negotiation of fringe benefits was done in his capacity as an employee of RPI, he said that he had so testified, and then clarified by answering
 
 
 20
 "It's very difficult to separate the entire process. We may be talking about wages in one breath for two minutes and go on to pension. We are not getting anywhere there. We'll move over to pension and welfare and jump back to wages. It's very difficult and you can't keep changing hats in midstream; you can't say, wait a minute, if you want to address me now as an officer in the local union, but you can't address me as an officer if we are discussing pension and welfare, it floats but I would say on the whole the great majority of time was spent with fringe benefit plan and explaining them at the negotiating table."
 
 
 21
 Self-evidently negotiation of fringe benefits is a labor relations matter entirely. When the "fringe" benefits have been won in the bargaining process and have been included in the labor contract, the amounts paid over by the employers to the various plans then for the first time become plan assets and the concern of those charged with fiduciary responsibility for administering the plans. Isola's testimony reflected the same insensitivity to fiduciary responsibility. He testified that before he began to be paid by RPI he had been paid by Local 806. He was then asked:
 
 
 22
 "Q At the time this switch occurred were there any changes in your job activities?
 
 
 23
 A Not of any big degree."
 
 
 24
 There was no escape from the court's conclusion that defendants caused RPI to make salary payments to Calagna, William Snyder, Isola and Clarke after February 4, 1977, for services actually rendered to Local 806 as well as to RPI, and that such payments were violative of the consent order which excepted only salary payments for services actually rendered to RPI.
 
 
 25
 One of the charges made in the complaint was that $380,000 had been expended to refurbish office quarters for the Union and for the Welfare, Pension and Annuity Funds, and that the whole expense had been charged to the Funds. Until a reallocation was made, RPI paid the entire rent for the refurbished premises. A reallocation of the rental was made largely under the direction of the accountant employed by the several plans, RPI and Local 806; he was to some extent assisted by the office manager. The result of the reallocation was to assign 43% Of the space and rent to RPI, 20% To the Welfare Plan, 20% To the Pension Plan, nothing to the Annuity Plan and 17% To Local 806. No basis for the allocation was made to appear. The dual roles played by so many of the employees of RPI and Local 806, the uncertainty as to the distribution of their time between the work for their two employers, the failure to explain how space could be allocated both to RPI and to the plans when RPI was responsible for plan administration, combine to deprive the allocation of any intrinsic validity.
 
 
 26
 The drastic relief granted fairly reflects the nature and the magnitude of the evasions of the command of the consent order and, more important, of the statute itself.
 
 
 27
 The fiduciary of an employee benefit plan under 29 U.S.C. § 1104(a)(1) is required to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the plan. Under 29 U.S.C. § 1106(a)(1) a plan fiduciary may not cause the plan to engage in a transaction if he knows or should know that the transaction directly or indirectly constitutes the furnishing of services or facilities between the plan and a "party in interest." "Party in interest" is defined elaborately and inclusively in 29 U.S.C. § 1002(14): it includes, in the case of employee benefit plans like those here involved, (a) any fiduciary (including without limitation any administrator, officer, trustee or custodian) or employee of an employee benefit plan, (b) any person providing services to such plan, and (c) an employee organization any of whose members are covered by such plan and (d) an employee or officer or director (or person holding similar responsibilities) of (i) a person providing services to such plan or (ii) an employee organization any of whose members are covered by such plan.
 
 
 28
 The transactions by which RPI paid the salaries of William Snyder, Anthony Calagna, James Isola and Clarence Clarke as well as those of two field representatives, Gonzalez and Kremens, for doing the work of Local 806 as well as a certain but indefinite amount of field work for RPI were, as Judge Pratt concluded, prohibited transactions within the meaning of 29 U.S.C. § 1106(a)(1) (C). The payments made to DeVuone, whose only work, as described in the evidence, was undefined messenger work and acting as personal chauffeur for defendant George Snyder, was, manifestly, a prohibited transaction.
 
 
 29
 Defendants argue that the transactions are exempt from the proscription of § 1106 by reason of the provisions of § 1108(b)(2). That subsection provides that the prohibitions of § 1106 do not apply to
 
 
 30
 "Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."
 
 
 31
 Defendants also point to that part of Section 1108(c)(3) which provides that Section 1106 shall not be construed to prohibit a fiduciary from
 
 
 32
 "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest."
 
 
 33
 The argument in essence appears to be that the consent order must be considered as setting a reasonable rate of compensation to Messrs. Calagna, Clarke, Isola and William Snyder, and that since they were not paid at greater rates than those set forth in the consent order, and tendered the described amount of service to RPI, the Secretary could avoid the exceptions of Section 1108(b)(2) and (c)(3) only by showing that the amounts were unreasonable. There are many difficulties with the argument. The consent order did not set reasonable rates. It stated the amounts beyond which payments could not be made. The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the defendants. Also, it would be new law to find that in a self-dealing transaction and prohibited transactions involve self-dealing the party representing the beneficiaries of the fiduciary whose self-dealing transaction is challenged must prove the unfairness of the transaction. The settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness. Nedd v. United Mine Workers of America, 3rd Cir. 1977, 556 F.2d 190, 210-211; cf. Pepper v. Litton, 1939, 308 U.S. 295, 306-307, 60 S.Ct. 238, 84 L.Ed. 281; Tomarkin v. Vitron Research Corp., 2nd Dept. 1960, 12 A.D.2d 496, 206 N.Y.S.2d 869; 3 Fletcher, Cyclopedia of the Law of Private Corporations (rev.perm.ed.1975) 362, 383. And, finally, there is no reasonable basis on which it could be found that a payment that fully compensates for two separate services can be supposed to be no more than a reasonable compensation for each service taken separately.
 
 
 34
 That Section 1108(c)(3), permitting for example, a union officer to serve as a fiduciary of an employee benefit plan, is irrelevant to the present case follows from the impropriety of the transactions involved. The sub-section is not a license to engage in prohibited transactions. It goes no farther than its terms; the fiduciary remains a "party in interest" and subject to the substantive requirements of Section 1106; that sub-section and § 1108(b)(2) simply make it possible to justify transactions which would otherwise be unequivocally prohibited transactions by demonstrating their fairness and reasonableness. They prevent the transactions from being invalidated simply because they are self-dealing transactions without further inquiry.
 
 
 35
 Defendants argue finally that the remedy of receivership is not warranted by the statutory scheme nor justified on the evidence. The statute does not explicitly provide for the appointment of a receiver. However 29 U.S.C. § 1109(a) provides that any person who is a fiduciary with respect to a plan who breaches any of the duties imposed upon fiduciaries by the statute not only is personally liable to make good to the plan any losses resulting from the breach, but also is "subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." Section 1132 of the statute, providing for civil enforcement, by sub-section (a)(5) empowers the Secretary to bring a civil action
 
 
 36
 "(A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; . . ."
 
 
 37
 The legislative history of ERISA makes it clear that, as the House report on HR2 indicates,
 
 
 38
 "The intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants." (H.Rep.No. 533, 93d Cong., 2d Sess., reprinted in (1974) 3 U.S.Code, Cong. & Admin.News, pp. 4639, 4655).
 
 
 39
 Senate Report No. 93-127 repeated the language of the House Report, in reporting on S.4, 93d Cong.2d Sess., reprinted in (1974) 3 U.S.Code Cong. & Admin.News, pp. 4639, 4871. Senate Report No. 93-383, reporting on S.1179, in discussing the broad range of remedies proposed in the Senate Bill said (id. 4989):
 
 
 40
 "Also, the bill specifically provides that a fiduciary may be removed through civil action brought by the Secretary or participants or beneficiaries if he has violated any of the specified fiduciary obligations, or is serving in violation of the criminal conviction provisions. (The Attorney General also may bring an action to remove in the latter case.) It is expected that a fiduciary (other than one serving in violation of the criminal conviction provisions) may be removed for repeated or substantial violation of his responsibilities, and that upon removal the court may, in its discretion, appoint someone to serve until a fiduciary is properly chosen in accordance with the plan."
 
 
 41
 The district court plainly had the power to appoint a receiver, Gordon v. Washington, 1935, 295 U.S. 30, 37, 55 S.Ct. 584, 79 L.Ed. 1282, and the appointment of a receiver in the present case was peculiarly appropriate to arrest what was shown at the evidentiary hearing to be continuing conduct violative both of the consent order and of the provisions of ERISA. The injunctions of the consent order had not, on the evidence, been obeyed, and the scale and circumstances of the ongoing expenditures threatened dissipation of the assets of the employee benefit plans. Cf. Bookout v. First National Mortgage and Discount Co., 5th Cir. 1975, 514 F.2d 757; Haase v. Chapman, W.D.Mo.1969, 308 F.Supp. 399, 404; United States v. Mansion House Center North Redevelopment Co., E.D.Mo.1976, 419 F.Supp. 85, 87; Securities & Exchange Commission v. Capital Counsellors, Inc., S.D.N.Y.1971, 332 F.Supp. 291, 304.
 
 
 42
 For the reasons stated above it is concluded that the three employee benefit plans should be joined as parties defendant, as they may be without difficulty under 29 U.S.C. § 1132(d)(1). In this case, in which the Secretary is the statutory plaintiff and sues in the interest of the beneficiaries, it is neither necessary nor appropriate that any individual beneficiaries be joined as parties. However, as the case develops, it may be appropriate for the district judge to provide notice to the members of Local 806 who participate in the plans.
 
 
 43
 Remanded with directions to add the employee benefit plans as parties defendants and, in all other respects, affirmed.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation