Raymond J. DONOVAN, Secretary of the
United States Department of
Labor, Plaintiff,

v.

Carroll DAUGHERTY, et al., Defendants.

Civ. A. No. 81–0470–H.

United States District Court,
S.D. Alabama, S.D.

Sept. 30, 1982.

392

T. Timothy Ryan, Sol. of Labor, Monica Gallagher, Associate Sol., Norman P. Goldberg, Counsel for Litigation, Plan Benefits Sec. Div., Bobbye Spears, Regional Sol., U.S. Dept. of Labor, Forrest R. Foss, Atty., Plan Benefits Sec. Div., Washington, D.C., William R. Favre, Jr., U.S. Atty., Mobile, Ala., for plaintiff.

Thomas M. Galloway, Jr., and Lawrence M. Wettermark, Mobile, Ala., for defendants.

AMENDED FINDINGS OF FACT AND
CONCLUSIONS OF LAW

HAND, Chief Judge.

This matter arose upon the Motion of the plaintiff, Secretary of the United States Department of Labor, for a summary judgment in his favor against all of the defendants. The Court has considered the pleadings, depositions, and exhibits on file and has fully considered all facts, documents, and arguments presented by the defendants. It appearing to the court that there is no genuine issue as to any material fact and that plaintiff is entitled to a judgment as a matter of law with respect to each of his claims against the defendants, the Court hereby makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT [1]

A. The Plans

1. The AFL–AGC Building Trades Pension Plan (the Pension Plan) was established in 1965 pursuant to the terms of collective bargaining agreements between local chapters of various unions comprising the Mobile, Alabama—Pensacola, Florida Building and Construction Trades Council (the Unions) and various employers comprising the Mobile Chapter, Associated General Contractors of America, Inc. (the Employers). (Agreed Facts, Par. 1).

2. The AFL–AGC Building Trades Welfare Plan (the Welfare Plan) was established in 1953 pursuant to the terms of collective bargaining agreements between the Unions and the Employers. It provides hospital, surgical and various death benefits. (Agreed Facts, Par. 2).

3. The Pension Plan and Welfare Plan (collectively the Plans) have been administered since their inception by a common group of six trustees, three appointed by the Unions and three appointed by the Employers. (Agreed Facts, Par. 3)

4. The duties of the trustees include discretionary control and authority for the overall operation and administration of the Plans. These duties include investing all assets of the Plans, determining the amount of and eligibility for benefits provided by the Plans, employing administrative, legal and other service providers, collecting contributions from employers, formulating and promulgating any and all rules necessary for the functioning of the Plans, and determining all questions of coverage and qualification for participation in and receipt of benefits from the Plans. (Agreed Facts, Par. 4).

B. The Trustees

5. The present trustees appointed by the Employers are N.J. Walton, J.C. Martin and W.C. Ernest. Mr. Walton has served as a trustee of the Plans since their inception; Mr. Martin since 1966; and Mr. Ernest since October, 1975. (Agreed Facts, Par. 5)

6. The present trustees appointed by the Unions are Robert Lowe, J.C. Reeves and Carroll Daugherty. Mr. Lowe has been a trustee of the Welfare Plan since 1963 and of the Pension Plan since its inception; Mr. Reeves has been a trustee of the Plans since 1966; and Mr. Daugherty was appointed to the Board of Trustees of each Plan in March, 1978. In addition, since July, 1978, defendant Daugherty has been the administrator of the Plans. (Agreed Facts, Par. 6).

C. The Illegal Payments

7. On September 20, 1977, the trustees of the Plans, by unanimous vote, authorized the Plans to make monthly payments to themselves for their services as trustees retroactively to July 1, 1977, (Exs. 55 & 109;

---

1. Except as noted herein, all references are to paragraphs of the "Agreed Facts" section of the Pretrial Order filed with the Court on March 18, 1982 by the parties. Other references to exhibits are to the exhibits on file with the Court. References to Exhibits 1–117 correspond to the exhibits filed with the Court on October 22, 1981 by defendants in their response to Plaintiff's First Request for Produc-

tion of Documents. The same numbering is used. References to Depositions are to depositions on file with the Court. References to Exhibits A–Q are to documents marked for identification at the depositions and are also on file with the Court (Daugherty Dep.Exs. A and B; Cleere Dep.Exs. C–O; Martin Dep.Exs. P and Q).

Reeves Dep. 18–19) and to pay the Plans' administrator a salary. (Exs. 55 & 109). From that time through April 1981, each of the trustees, pursuant to monthly resolutions passed by the trustees at their monthly meetings, approved and authorized the payments referred to in paragraphs 12, 19, 27, 36, 37, and 43, *infra*.

8. W.C. Ernest has been a 51% managing partner in the Ernest Construction Co. since before July 1, 1977. (Agreed Facts, Par. 8). In this position, he has been the person principally responsible for running the operation and affairs of that company. (Agreed Facts, Par. 8). In 1977, defendant Ernest's income from the Ernest Construction Co. was $94,725; in 1978 and 1979 he received approximately $500 a week from this company and in 1980, his income from the company was $60,388. (Agreed Facts, Pars. 9–13).

9. From sometime before July 1, 1977 continuously through at least November, 1981, Ernest Construction Co. has been a signatory to each of the collective bargaining agreements executed between the Unions and Employers and the employees of Ernest Construction Co. have been participants in the Plans. (Agreed Facts, Par. 14).

10. In addition to the income he received from Ernest Construction Co., defendant Ernest received income from other sources as follows:

a. The total income reported on line 21 of Ernest's Internal Revenue Service Form 1040 for 1977 was $130,926.00. This return reflected income from Ernest Construction Co. of $94,725.00, interest income of $549.00, dividend income of $983.00, rental income from properties located in Mobile, Alabama and Baton Rouge, Louisiana of $29,651.00, income from the rental of dock space in the amount of $525.00, and rental income from a Carrington Foods Building in the amount of $1,692.00. (Agreed Facts, Par. 9).

b. In 1978 and 1979 the Internal Revenue Service Partnership return Forms 1065 for Ernest Construction Co. reflected net losses. Ernest took a weekly draw from the capital account in the amount of approximately $25,000.00 for each of these two years. (Agreed Facts, Par. 10).

c. In 1978 the total income reported on line 21 of Ernest's Internal Revenue Service Form 1040 was $34,085.00. This return reflected approximately $5,000.00 in interest income, $1,600.00 in dividend income, $30,406.00 in rental income from the Mobile-Baton Rouge properties, $2,108.00 from the rental docks, $1,692.00 from the Carrington Foods Building and $600.00 in other land rentals.

d. In 1979 the total income reported on line 22 of Ernest's Internal Revenue Service Form 1040 was $21,060.00. This return reflected interest income of approximately $500.00, dividend income of approximately $400.00, $58,462.00 in rental income from the Mobile-Baton Rouge property, $9,185.00 from the rental docks, $3,600.00 from the Carrington Foods Building and land rental in the amount of approximately $250.00.

e. In 1980 Ernest's income reported on line 22 of Internal Revenue Service Form 1040 was $97,651.00. This return reflected income Ernest received from Ernest Construction Co. of $60,388.00, interest income of approximately $11,000.00, dividend income of approximately $1,000.00, oil royalties of $8,070.00, $22,755.00 from the rental docks and $9,192.00 from the Carrington Foods Building.

11. Ernest spends approximately fifty hours a week attending to his business affairs. Approximately sixty per cent of his time or thirty hours a week is spent on Ernest Construction Co. business. He spends approximately twenty per cent of his time or ten hours a week on a partnership known as Ernest-Corringan; five hours a week managing an enterprise known as Industrial Constructors; approximately two and one-half hours a week running a company known as Mobile Steel Fabricators; one hour a week running a 340 acre farm; and, in addition, he has some duties with an outfit known as Ernest Equipment Company. (Agreed Facts, Par. 16(b)).

12. From July 1, 1977 through April, 1981, defendant Ernest received monthly payments from the Plans as compensation

for his service as a trustee. For the period July 1, 1977 through December, 1977, these payments equalled $4,312; in 1978, they totalled $8,262; in 1979, $8,262; and in 1980, $7,546. For the period January 1, 1981 through April 30, 1981, defendant Ernest received a total of $2,156 in payments from the Plans. He has not received any payments for any period after April 30, 1981. The total amount of payments received by defendant Ernest from July 1, 1977 through April 30, 1981 from the Plans was $30,538. (Agreed Facts, Par. 15).

13. Since July 1, 1977, defendant Ernest has not incurred any out of pocket expenses in carrying out his duties and responsibilities as a trustee of the Plans and none of the above listed payments from the Plans was a reimbursement for any actual expenses incurred by defendant Ernest (Ernest Dep. 14–15).

14. Except for one highly speculative incident, since July 1, 1977, the income received by defendant Ernest from Ernest Construction Co. has not been reduced by any of his activities as a trustee of the Plans (Ernest Dep. 58–70).

15. Defendant N.J. Walton was a 50% partner in J.S. Walton Co. from before July 1, 1977 until July 1, 1980 when the company ceased doing business as a partnership and was succeeded by J.S. Walton & Co., Inc. During the period when he was a partner in the company, Walton was responsible, along with one other person, for running its day-to-day operations. In 1977, his income from the partnership was $363,433; in 1978, $88,-885; in 1979, $469,946; and in 1980, $239,-051. In 1980, he received $36,000 in income from J.S. Walton & Co., Inc. for his duties as president. As president, Walton was the highest paid person in the corporation. (Agreed Facts, Par. 17).

16. From July 1, 1977 through July 1, 1980, J.S. Walton Co. was a signatory to each of the collective bargaining agreements executed between the Unions and Employers. During this entire period, the employees of J.S. Walton Co. were participants in the Plans. On July 1, 1980, J.S. Walton Co. ceased to be a signatory to such collective bargaining agreements. J.S. Walton & Co., Inc. made contributions to the Plans on behalf of at least some of its employees from July 1, 1980 through at least November, 1981. (Agreed Facts, Par. 18).

17. Defendant Walton has had income from sources other than J.S. Walton Co. and J.S. Walton & Co., Inc. as follows:

a. In 1977, Walton received $51,900 in income from Okaloosa Asphalt Co. (Okaloosa), a company of which he is president. His income from all other sources in 1977 was $18,438. (Agreed Facts, Par. 17).

b. In 1978, Walton's income from Okaloosa was $22,500 and from all other sources, $15,953. (Agreed Facts, Par. 17).

c. In 1979, Walton's income from Okaloosa was $17,500 and from all other sources $23,729. (Agreed Facts, Par. 17).

d. In 1980, Walton's income from Okaloosa was $29,230 and from all other sources $37,310. (Agreed Facts, Par. 17).

18. Walton spends approximately ten hours a day six days a week and sometimes hours on Sundays attending to his business affairs. Since July 1, 1977 he has averaged ten or twelve hours a week on J.S. Walton Co. and J.S. Walton Co., Inc. work. In addition, he has devoted approximately thirty to forty hours a week to Okaloosa. He spends approximately four to five hours a week with Manhattan-Walton Joint Venture which is a signatory to the collective bargaining agreement. He receives no compensation or pay directly from Manhattan-Walton. J.S. Walton Co., Inc., and before that J.S. Walton Co., was, at all times material to this action, a joint venturer in Manhattan-Walton and derived income from the joint venture. (Agreed Facts, Par. 22).

19. From before July 1, 1977 through April 30, 1981, defendant Walton received monthly payments from the Plans as compensation for his service as trustee. From July 1, 1977 through December, 1977, these payments totalled $4,414; in 1978, the payments equalled $7,546; in 1979, $8,025; and in 1980, $8,025. From January 1, 1981

through April 30, 1981, defendant Walton received $2,156 in payments from the Plans but has not received any payments for any period after April 30, 1981. The total amount of payments received by defendant Walton from the Plans while employees of J.S. Walton Co. or J.S. Walton & Co., Inc. were participants in the Plans was $30,166. (Agreed Facts, Par. 19).

20. Except for some unspecified minor expenses, since July 1, 1977, defendant Walton has not incurred any significant out of pocket expenses in carrying out his duties and responsibilities as a trustee of the Plans, and none of the above listed payments received by him from the Plans was a reimbursement for any actual, specific expense incurred by him. (Walton Dep. pp. 12–15; Betancourt Dep. pp. 8–9; See Agreed Facts, Par. 21).

21. Except for some unspecified and speculative instances, the income received by defendant Walton from J.S. Walton Co. and J.S. Walton Co., Inc. was not reduced by his activities as a trustee of the Plans. (Walton Dep. 48–51).

22. Since 1966, defendant J.C. Martin has been the president of Martin Builders, Inc. and the person principally responsible for running the company. From July 1, 1977 to the present, he has been the majority shareholder of the company and during this time, no person received more compensation from the company than he. In 1977, Mr. Martin received $41,600 in income from Martin Builders, Inc.; in 1978, $37,100; in 1979, $37,935; and in 1980, $48,885. (Agreed Facts, Par. 24).

23. Martin Builders, Inc. was a signatory to collective bargaining agreements between the Unions and the Employers from July 1, 1977 until June 30, 1978, and from July or August 1979 until June 30, 1980. During these two periods, the employees of Martin Builders, Inc. were participants in the Plans. (Agreed Facts, Par. 25).

24. Defendant Martin has received income from sources other than Martin Builders, Inc. for the period 1977–1980.

    a. In 1977, Martin received $12,722 in interest income, $31,600 in income of rental of heavy equipment, $61,089.00 from his partnership interest in Mobile Greyhound Park, $97,468.00 from Azalea City Racing, and was involved in a variety of other small partnerships, drilling ventures, and small businesses (Agreed Facts, Par. 24). His adjusted gross income as reported on IRS Form 1040 for this year was $111,689. (Exhibit P, Martin Dep. 32–33, 44–46).

    b. In 1978, he received $11,892.00 in interest income, $15,800.00 from equipment rentals, $94,473.00 from Mobile Greyhound Park, $11,152.00 from Azalea City Racing, a dividend from Azalea City Racing in the amount $141,152.00, $49,206.00 in capital gains from the sale of heavy equipment, and he was involved in a variety of other small partnerships, drilling ventures, and small businesses (Agreed Facts, Par. 24). His adjusted gross income for 1978 as reported on his IRS Form 1040, was $166,264. (Exhibit P, Martin Dep. 32–33, 44–46).

    c. In 1979, Martin received $50,000.00 in salary from Azalea City Racing, $273.00 from Elderly Turn-Key Housing, $31,607.00 in interest income, $104,926.00 from Mobile Greyhound Park, $25,777.00 from Azalea City Racing, an additional $177,575.00 in dividends from Azalea City Racing, and he was involved in a variety of other small partnerships, drilling ventures, and small businesses (Agreed Facts, Par. 24). His adjusted gross income for 1979, as reported on his IRS Form 1040, was $396,336. (Exhibit P, Martin Dep. 32–33, 44–46).

    d. In 1980, Martin received $50,000.00 in salary from Azalea City Racing, $93,000.00 in salary from Elderly Turn-Key Housing, $15,752.00 in interest income, $89,530.00 from Mobile Greyhound Park, $52,384.00 in dividends from Azalea City Racing, and was involved in other small partnerships, drilling ventures and small businesses

(Agreed Facts, Par. 24). His adjusted gross income for 1980, as reported on his IRS Form 1040, was $316,386. (Exhibit P, Martin Dep. 32–33, 44–46).

25. At the present time Martin estimates that he works a 60 hour week. Half of his time is spent with Martin Builders and half with the Mobile Greyhound Park and Azalea City Racing and other business ventures. In 1980 his time was split in a similar manner. In 1979 he probably spent a little more time with Martin Builders. In 1978 he again split his time fifty-fifty. In 1977 sixty percent of his time was probably spent with Martin Builders. (Agreed Facts, Par. 29).

26. In addition to Martin Builders, Martin is involved with Elderly Turn-Key Housing, a partnership developing an eleven story, 122 unit housing structure for the elderly. Martin was actively engaged in this project from 1976 to 1980. He estimates that his total time per year spent in this project would add up to a month to two months. Martin Builders was the builder for this project. Martin is also involved in the day to day operation of Azalea City Racing Club, Inc., and Mobile Greyhound Park. He owns a one-seventh interest in the park. Mobile Greyhound Park does not have a general manager and each partner has duties assigned to him. Martin looks after the mutuel department and the maintenance department. He has constant duty with respect to these departments. In addition, one of the partners is on duty at the track one day a week. He assumes all general managerial responsibility on that particular day. Also, one day a week the partners have a general board meeting. Martin estimates that he puts in between twenty and thirty hours a week with the Greyhound Park. Finally, Martin has an interest in a variety of small businesses and other small partnerships. (Agreed Facts, Par. 30–32).

27. From July 1, 1977 through April 1, 1981, J.C. Martin received monthly payments from the Plans as compensation for his service as a trustee. For the period July 1, 1977 through December 31, 1977, these payments totalled $4,012.50; from January 1, 1978 through June 30, 1978, they totalled $4,013; from July 1, 1979 through December 31, 1979, the payments equalled $3,773; and for the six months of January through June 30, 1980, they totalled $4,131. The total amount of these payments made to defendant Martin when Martin Builders, Inc. was a signatory to a collective bargaining agreement between the Employers and Unions and had employees who were participants in the Plans was $15,929. (Agreed Facts, Par. 26).

28. Since July 1, 1977, defendant Martin has not incurred any out of pocket expenses in carrying out his duties and responsibilities as a trustee of the Plans, and none of the above listed payments from the Plans was a reimbursement for any actual expenses incurred by defendant Martin. (Martin Dep. 11–13).

29. Since July 1, 1977, the income received by defendant Martin from Martin Builders, Inc. has not been reduced by his activities as a trustee of the Plans. (Martin Dep. 47–48).

30. Robert Lowe has been the financial-secretary and business agent/manager of the International Union of Operating Engineers Local 653 (Local 653) since 1958. In this position, Mr. Lowe has been the person principally responsible for running the day to day operation of the local. His duties include negotiating contracts, seeing that negotiated working rules are complied with, and ensuring that employer-contractors are furnished with qualified personnel and that the members of Local 653 are given jobs commensurate with their job classification (Agreed Facts, Par. 33)

31. In consideration of the services he renders, Mr. Lowe received a salary from Local 653 of $31,176 in 1977; $32,859 in 1978; $33,397 in 1979; and $32,986 in 1980. (Agreed Facts, Par. 34)

32. Since at least July 1, 1975, no officer or other person has received more income from Local 653 than Mr. Lowe. (Agreed Facts, Par. 35)

33. From July 1, 1977 to the present, Local 653 has been a signatory to each of the collective bargaining agreements between the Unions and Employers. During this entire period of time, the members of Local 653 have been participants in the Plans. (Agreed Facts, Par. 36)

34. Dependent Lowe has income from sources other than Local 653 as follows:
a. In 1977, Lowe received income from rental trailers he owned jointly with his wife in the amount $2,655.00, income from Blue-Run Greyhound Training Track which he owned one-half interest with his wife in the amount $4,111.00, and winnings on Greyhound dogs from Mobile Greyhound Park in the amount $2,013.00. (Agreed Facts, Par. 34)
b. In 1978 he received interest income amounting to $2,152.00, income from the Mobile, Alabama-Pensacola, Florida Building Trades Council in the amount $456.00, and Blue-Run Kennels, in which Lowe owned 50 percent interest, reflected gross receipts in excess of $9,000.00. (Agreed Facts, Par. 34)
c. In 1979, Lowe received $4,029.00 in interest, and Blue-Run Kennels reported gross receipts in excess of $6,000.00. (Agreed Facts, Par. 34)
d. In 1980, Lowe received $3,628.00 in interest income, Blue-Run Kennels reported gross receipts of $7,547.00, and earnings from pari-mutuel wagering on the greyhounds and a mineral lease amounted to $4,070.00. (Agreed Facts, Par. 34)

35. Lowe spends anywhere from five to six hours a day working on Local 653 business. Lowe lives on the farm located adjacent to Blue-Run Kennels. He goes to the kennel at approximately 6:00 a.m. each weekday morning. He estimates that he spends approximately two and one-half to three hours each weekday and more time on weekends attending to kennel business. He maintains the lure on the training track and helps maintain the dogs kept in the kennel. He assists in weighing the dogs, giving the dogs their shots and seeing that the dogs are provided with food. (Agreed Facts, Par. 40)

36. From July 1, 1977 through April 1981, Mr. Lowe received monthly payments from the Plans as compensation for his service as trustee. For the period July 1, 1977 through December 31, 1977, these payments equalled $4,380; in 1978, they totalled $5,390; in 1979, $8,262; and in 1980, $8,262. In 1981, Mr. Lowe received a monthly payment of $539 from the Plans for the months January through April, 1981 for a total of $2,156. The total of these payments from July 1, 1977 through April 30, 1981 was $28,450. Mr. Lowe has not received any such payments from the Plans for any period after April 30, 1981. (Agreed Facts, Par. 37)

37. In addition to the above payments, for the months of May, June and July, 1978 Lowe served as the Plans' administrator and received a total of $4,245 in compensation for his services therefore. (Agreed Facts, Par. 38)

38. Apart from attendance at a conference on employee benefit plans, for which he was otherwise fully reimbursed, defendant Lowe has not, since July 1, 1977, incurred any out of pocket expenses in carrying out his duties and responsibilities as a trustee of the Plans, and none of the above-listed payments from the Plans was a reimbursement for actual expenses incurred by Mr. Lowe. (Lowe Dep. 14–15)

39. Carroll Daugherty has been the business manager of the Millwright & Machinery Erectors, Inc. Local 2734 since 1956. In this position, he has been the person principally responsible for running the day to day operation of that local. (Agreed Facts, Par. 41)

40. In consideration of the services he has rendered, defendant Daugherty received a salary from Local 2734 of $19,027 in 1977; $22,427 in 1978; $23,685 in 1979; and $23,760 in 1980. Since 1977, defendant Daugherty has been the only union officer to receive compensation from Local 2734. (Agreed Facts, Par. 42)

41. From sometime before July 1, 1977, continuously to the present, Local 2734 has

been a signatory to each of the collective bargaining agreements executed between the Unions and Employers. During this entire period of time, the members of Local 2734 have been participants in the Plans. (Agreed Facts, Par. 43)

42. From 1977 through 1980, defendant Daugherty was associated with J & J Construction & Maintenance Contractors, Inc., (J & J). During that entire period of time, J & J was a signatory to each of the collective bargaining agreements executed between the Unions and Employers and the employees of J & J were participants in the Plans. For the services he rendered to J & J, Daugherty received compensation of $52,000 in 1978; $52,000 in 1979; and $25,000 in 1980. (Agreed Facts, Par. 44)

43. Since July 1, 1978, defendant Daugherty has been the administrator of the Plans and in that capacity has been responsible for running the daily operation of the Plans and their office in Mobile, Alabama. For his services as Administrator, Daugherty received from the Plans a salary of $16,500 in 1978; $37,500 in 1979; $37,500 in 1980; and $6,238.84 for the months of January through April, 1981. He has not received any compensation from the Plans for the period after April 30, 1981. (Agreed Facts, Par. 45)

44. Since July 1, 1977, the compensation to which defendant Daugherty was contractually entitled from J & J and Local 2734 was not reduced in any manner as a result of his activities on behalf of the Plans. (Daugherty Dep. 80–81, 84, 87–91)

45. Defendant Daugherty's sources of income apart from the Plans, Local 2734 and J & J for the period 1978–1980, have been as follows:

a. In 1978, he received $600 in salary as Mayor of the town of McIntosh, Alabama and $5,878 in salary from the Mobile Pensacola Building Trades Council. (Agreed Facts, Par. 44)

b. In 1979, he received $900 from the town of McIntosh, $8,060 from the Mobile-Pensacola Building Trades Council, $7,091 in interest and approximately $55 in dividends. (Agreed Facts, Par. 44)

c. In 1980, Daugherty received $900 from the town of McIntosh, $8,060 from the Mobile-Pensacola Building Trades Council, $7,851 in interest and approximately $474 in dividends. (Agreed Facts, Par. 44)

46. Daugherty generally works five days a week. He is normally at the Plans' office from approximately 10:00 in the morning until 4:30 in the afternoon. Ninety per cent of the time that he spends at the Plans' office is related to the Plans' business. Daugherty normally arrives between 7:00 and 7:30 a.m. at the Millrights Local 2734 office. He stays there for approximately two hours. He then goes to the Plans' office until approximately 4:30 p.m. Following that he generally drops by Local 2734 for approximately one hour. On some occasions he has meetings at night of the Southwest Alabama Labor Council, the Port City Council, the Building Trades Council or the Millrights Local. (Agreed Facts, Par. 47)

47. Daugherty is also Business Agent for the AFL–CIO Mobile, Alabama-Pensacola, Florida Building and Construction Trades Council, an association of business agents. The council meets for an hour and one-half each Tuesday morning, and Daugherty's duties include negotiating the collective bargaining contract for all council members, making contact with contractors intending to bid jobs in the area, information gathering, etc. (Agreed Facts, Par. 49) In addition, Daugherty is Mayor of the Town of McIntosh. His official duties include attending two meetings a month. Each meeting lasts about an hour. (Agreed Facts, par. 49)

48. Prior to the time that Daugherty became a trustee, he performed work for J & J Construction. He assisted them in bidding a job and also in supervising the job. During this period of time he worked approximately forty-four hours a week for J & J. He was an employee of J & J but was paid on a percentage of the job basis. Since July of 1978, Daugherty has done no work for J & J but he continued to receive his percentage over time, receiving $1,000.00

per week. He has received no further payment from J & J since the last payment was made sometime in 1980. (Agreed Facts, Par. 50)

## D. Trustee Activities

49. Meetings of the Plans' trustees are held once every month and last approximately two hours. The meeting for each Plan is approximately one hour long, and each meeting for the Pension Plan follows immediately each meeting for the Welfare Plan. All meetings are held at the office of the Plans in Mobile, Alabama on the third Tuesday of each month beginning at 1:00 p.m. Defendants Ernest, Martin, Walton and Lowe have each received the monthly payment referred to in paragraphs 12, 19, 27, and 36 even in those instances where he did not attend the monthly meeting of the trustees. (Agreed Facts, Par. 52)

50. Apart from his attendance at the monthly meeting of the Plans' trustees and meetings of the Associated General Contractors (AGC) where he informs the AGC of affairs of the Plans which may affect AGC contractors, for the period July 1, 1975 to the present, defendant Ernest spent an average of three hours per month in carrying out his trustee duties and responsibilities. (Agreed Facts, Par. 16(a))

51. Apart from his attendance at the monthly meeting of the Plans' trustees, for the period July 1, 1975 to the present, defendant Martin spent an average of one to two hours per week in carrying out his trustee duties and responsibilities. (Agreed Facts, Par. 27)

52. Apart from his attendance at the monthly meeting of the Plans' trustees, for the period July 1, 1975 to the present, defendant Reeves spent an average of two to three hours per week in carrying out his trustee duties and responsibilities. (Agreed Facts, Par. 54)

53. Apart from his attendance at the monthly meetings of the Plans' trustee, for the period July 1, 1975 to the present, defendant Walton spent an average of four hours per week in carrying out his trustee duties and responsibilities. (Agreed Facts, Par. 20)

54. Apart from his attendance at the monthly meetings of the Plans' trustees, for the period July 1, 1975 to the present, defendant Lowe spent an average of ten hours per week in carrying out his trustee duties and responsibilities. (Agreed Facts, Par. 55)

## E. The Defendants' Participation in the Plans

55. Eligibility for participation in each of the Plans requires, in accordance with the terms of the documents of each of the Plans, that, among other things, an employer (as defined by the terms of the applicable documents of the Plans) make the contributions to the Plans required under the collective bargaining agreements between the Unions and Employers on behalf of an eligible employee (as defined by the terms of the applicable documents of the Plans). (Ex. 2, Art. III, pp. 43–45; Ex. 5, p. 4 and Arts. II–IV, pp. 14–17)

56. Each of the collective bargaining agreements executed between the Unions and the Employers requires that each Contractor (as defined) pay a specified amount per hour to the Plans for all hours worked by its employees who participate in the Plans. (Ex. 7, Art. XV, pp. 25–26; Ex. 8, Art. XV, pp. 12–13; Ex. 9, Art. XV, pp. 11–12). Such employer contributions are made solely on the basis of the hours which the employees actually work. (Daugherty Dep. 124–129)

57. On April 14, 1972, the then trustees of the Plans authorized the Plans to make contributions on behalf of themselves and Mr. Galloway (Agreed Facts, Par. 57) in order to make them eligible to participate in and receive benefits from the Plans. (Exs. 51 and 95). Pursuant to this authorization, the trustees and Mr. Galloway have been treated as employees of the Plans (within the meaning of the applicable documents of the Plans) and the Plans have been treated as employers (within the meaning of the applicable documents of the Plans) through at least October, 1981.

(Agreed Facts, Par. 57) These designations were made solely for the purpose of making the trustees and Mr. Galloway eligible to receive benefits from the Plans and causing the Plans to make the contributions required for the participation of the defendants in the Plans. (Galloway Dep. 16; Exs. 51 & 95). With the exception of defendant Daugherty, none of the trustees or defendant Galloway is considered an employee of the Plans for any purpose other than their participation in the Plans (Galloway Dep. 16), and the Plans do not pay or withhold any money on their behalf with respect to FICA or unemployment benefits. (Agreed Facts, Par. 57)

58. From 1972, through the present, each of the defendant trustees, during the entire time he has been a member of the Board of Trustees, and defendant Galloway have been classified as employees of the Plans and been credited with 40 hours of work per week for the Plans. (Agreed Facts, Par. 58)

59. With certain exceptions, not relevant to this action, all persons, other than defendants, participating in the Plans are credited, under the applicable documents of the Plans, for the purpose of making them eligible to receive benefits from the Plans, only with the number of hours which they actually work for the employer who makes contributions on their behalf. (Daugherty Dep. 109, 124–125, 128–129; Betancourt Dep. 29–30)

60. Pursuant to the trustees' authorization referred to in paragraph 57 above, from January 1, 1975 through at least November 30, 1981, the Plans have made contributions on behalf of each of the trustees, during his tenure as a trustee, and Mr. Galloway, on the basis of 40 hours per week at the rates specified in the collective bargaining agreements between the Unions and Employers. (Agreed Facts, Par. 59)

61. From January 1, 1975 to the present, the contribution rates per credited hour of work for each participant in the Welfare Plan have been, as set forth in the collective bargaining agreements between the Unions and Employers, $.40 per hour for the period July 1, 1977 through July 1, 1980; $.55 per hour from August 1, 1980 through December 31, 1980; and $.65 per hour for the period January 1, 1981 through July 31, 1982. (Art. XV of Exs. 7, 8 and 9; Daugherty Dep. 116–119)

62. From January 1, 1975 to the present, the contribution rates per credited hour of work for each participant in the Pension Plan have been, as set forth in the collective bargaining agreements between the Unions and Employers, $.50 per hour for the period July 1, 1977 through July 31, 1981 and $.60 per hour for the period August 1, 1981 through July 31, 1982. (Art. XV of Exs. 7, 8 and 9; Daugherty Dep. 116–119)

63. Since January, 1975, eligibility to receive benefits from the Welfare Plan has, in accordance with the terms thereof, required the completion of four consecutive payroll periods (a payroll period equals one week) during which the person has worked at least 100 hours for one or more employers each of whom have contributed to the Plan, (Betancourt Dep. 27–28; Ex. 2, pp. 44–46, §§ 3.1, 3.3, 4.3)

64. With the exception of Carroll Daugherty, each of the defendants, has accrued at least 100 hours for every four consecutive payroll periods, as defined in the Welfare Plan, in each of the years 1976–1981, inclusive. (Agreed Facts, Par. 70) This has been as a result of the classification and crediting procedure set forth in paragraph 58 above. (Pars. 48–54, *supra*, Agreed Facts, Par. 60(b)) Each of the defendants, as a result of the classification and crediting procedure set forth in paragraph 58 above, has been eligible to receive benefits from the Welfare Plan on the same basis as other participants in the Welfare Plan. (Agreed Facts, Par. 60(b))

65. From July 1, 1977 through October 31, 1981 benefits of $4,833.74 were paid to, or on behalf of, W.C. Ernest, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 61)

66. From July 1, 1977 through October 31, 1981, benefits of $702.49 were paid to, or on behalf of, J.C. Martin, or his eligible

dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 62)

67. From July 1, 1977 through October 31, 1981, benefits of $5,895.30 were paid to, or on behalf of, N.J. Walton, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 63)

68. From July 1, 1977 through October 31, 1981 benefits of $9,962.66 were paid to, or on behalf of, R.H. Lowe, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 64)

69. From July 1, 1977 through October 31, 1981, benefits of $34.00 were paid to, or on behalf of, Carroll Daugherty, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 65)

70. From July 1, 1977 through October 31, 1981, benefits of $9,185.36 were paid to, or on behalf of, J.C. Reeves, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 66)

71. From July 1, 1977 through October 31, 1981, benefits of $3,409.72 were paid to, or on behalf of Thomas Galloway, or his eligible dependents, from the assets of the Welfare Plan. (Agreed Facts, Par. 67)

72. Eligibility to receive a normal retirement benefit under the Pension Plan requires, among other things, that an "Active Participant" (as defined) attain age 62 and accrue at least 5,000 "Hours of Work" (as defined) over the five consecutive plan years last preceding the attainment of age 62. (Ex. 5, Art. IV, p. 17). To be an "Active Participant" a person must be an "Employee." (Ex. 5, Art. II, § 2.1(b)). An "Employee" is defined as:

Every person whose employment with an Employer is covered by the terms of collective bargaining agreements between the Union and the various Employers comprising the Mobile Chapter, Associated General Contractors of America, Inc. Such term shall also include bonafide representatives of Employers [sic] of the Union, provided the Union is making the required Employer contributions on behalf of such bonafide representatives or Employees. (Ex. 5, Art. II, § 2.1(h), p. 15)

73. Each of the defendants has accrued at least 5,000 hours of credited service for purposes of making them eligible to participate in and receive benefits from the Pension Plan. (Agreed Facts, Par. 68) With the exception of Carroll Daugherty, this accrual has been solely the result of the crediting and classification procedure referred to in paragraph 58 above. (Pars. 49–54, 57–58, supra)

74. The amount of the monthly normal retirement benefit from the Pension Plan is the greater of $175.00 or the amount equal to $6.00 multiplied by the pensioned participant's years of credited service. (Ex. 5; Art. IV, p. 17). Under the terms of the Pension Plan, a participant receives one year of credited service for every plan year in which such participant is credited with 1,400 or more "Hours of Work"; and a participant receives zero years of credited service for every plan year in which the participant is credited with less than 500 "Hours of Work." (Ex. 5, Art. II, pp. 14–15)

75. With the exception of Carroll Daugherty, each of the defendants has been credited with more than 1,400 "Hours of Work" for the Pension Plan in 1976, 1977, 1978, 1979, 1980 and 1981. (Agreed Facts, Par. 69) This crediting was solely the result of the crediting and classification procedure referred to in paragraph 58 supra. (Par. 49–54, 57–58, supra)

76. By letter of April 5, 1972 Thomas Galloway informed the then trustees of the Plans that in his opinion it would be proper for the trustees to embark on the course of action described in paragraphs 57, 58 and 60, supra. (Agreed Facts, Par. 71)

77. Mr. Galloway has been the principal counsel to the Plans continuously from before January 1, 1975 to the present and has regularly attended the monthly meetings of the trustees. (Agreed Facts, Par. 72)

78. During the entire time in which he has been counsel to the Plans, Mr. Galloway was aware of and provided legal advice to the trustees with respect to their actions as

referred to in paragraphs 57, 58 and 60, *supra.* (Agreed Facts, Par. 73)

## CONCLUSIONS OF LAW

### I. BACKGROUND

■ 1. The AFL–AGC Building Trades Pension Plan (the Pension Plan) is an employee benefit plan within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and, therefore, is subject to coverage under ERISA pursuant to § 4 of the Act, 29 U.S.C. § 1003.

2. The AFL–AGC Building Trades Welfare Plan (the Welfare Plan) also is an employee benefit plan within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and, therefore, also is subject to coverage under ERISA pursuant to § 4 of the Act, 29 U.S.C. § 1003.

■ 3. The defendant trustees of the Pension Plan and Welfare Plan (the Plans) have been fiduciaries with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), at all times relevant to this action.

■ 4. The plaintiff Secretary of Labor has standing to bring this action under ERISA § 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) and (5). Jurisdiction and venue are proper under ERISA § 502(e)(1) and (2), 29 U.S.C. § 1132(e)(1) and (2).

■ 5. ERISA is a comprehensive remedial statute enacted for the purpose of protecting the interests of plan participants and beneficiaries, and preserving the integrity of plan assets. *Marshall v. Snyder,* 430 F.Supp. 1224, 1231 (E.D.N.Y.1977), *aff'd* 572 F.2d 894 (2nd Cir.1978); *Brink v. DaLesio,* 496 F.Supp. 1350, 1367 (D.Md.1980), *aff'd* 667 F.2d 420 (4th Cir.1981); *Connolly v. Pension Benefit Guaranty Corporation,* 581 F.2d 729, 731–732 (9th Cir.1978); *Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir.1978); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 634 (W.D.Wis.1979); *Marshall v. Kelly,* 465 F.Supp. 341, 349 (W.D.Okl. 1978).

■ 6. The provisions of ERISA are to be interpreted both in the light of the common law of trusts, and the special nature, purpose, and importance of modern employee benefit plans. *Marshall v. Glass/Metal Assoc. and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 383 (D.Haw. 1980); *Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 & n. 8 (E.D.N.Y.1978).

■ 7. To fulfill its curative aim, ERISA should be given liberal construction to protect the interest of plan participants and beneficiaries. *Gilliam v. Edwards,* 492 F.Supp. 1255, 1261 (D.N.J.1980), appeal pending; *Freund v. Marshall & Ilsley Bank, supra,* 485 F.Supp. at 634; *Marshall v. Kelly, supra* 465 F.Supp. at 349.

■ 8. Section 404 of ERISA, 29 U.S.C. § 1104, sets forth the general standards governing fiduciary conduct requiring, among other things, that fiduciaries discharge their duties solely in the interest of plan participants and beneficiaries, for the exclusive purpose of providing them benefits and in accordance with the documents and instruments governing the plan.

9. ERISA § 406(a), 29 U.S.C. § 1106(a), provides generally that a fiduciary may not engage in any transaction which involves a direct or indirect exchange of assets or property between a plan and a party-in-interest. ERISA § 406(b) is specifically directed at the problem of fiduciary self-dealing and absolutely prohibits a fiduciary from acting in a conflict of interest situation where his loyalties to the plan may be compromised or divided.

10. The fact that a fiduciary may have acted in good faith is not a defense where breaches of his fiduciary duties are established. *See, Cutaiar v. Marshall,* 590 F.2d 523, 528 (3d Cir.1979); *Donovan v. Mazzola* (N.D.Cal.1981) (reported in 2 BNA Employee Benefit Cases 2115, 2133); *Marshall v. Glass Metal Assoc. and Glaziers and Glassworkers Pension Plan, supra,* 507 F.Supp. 378; Bogert, *Trusts & Trustees* (2d ed. 1975) (Bogert) § 541, p. 451.

■ 11. Once a court makes the determination that fiduciaries have engaged the

plan, even indirectly, in a transaction with parties-in-interest in any of the ways set forth in ERISA section 406(a) or 406(b), its only remaining inquiry is to determine whether the transaction is subject to an applicable exemption under ERISA § 408(b), 29 U.S.C. § 1108(b), which provides a number of statutory exemptions for otherwise prohibited conduct. *Gilliam v. Edwards, supra,* 492 F.Supp. at 1262–1265.

12. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits a fiduciary of a plan from using plan assets to benefit a party in interest.[2]

13. The facts set forth above clearly demonstrate that the trustee defendants violated ERISA § 406(a)(1)(D), by authorizing for each other monthly payments from the Plans' assets as compensation for their services as trustees and by authorizing the Plans to make contributions on their behalf so as to make each other eligible for the receipt of benefits from the Plans.

14. In the face of their *prima facie* violations of ERISA § 406(a), defendants' only possible defense is that one of the statutory provisions of ERISA § 408 exempts their otherwise prohibited conduct.

15. The statutory exemptions which are relevant here are sections 408(b)(2) and 408(c)(2). Section 408(b)(2) provides that the prohibitions of ERISA § 406[3] shall not apply to:

(2) Contracting or making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

This exemption allows a party in interest, including a fiduciary, to render services to a plan for compensation provided "(1) such service is necessary for the establishment or operation of the plan; (2) such service is furnished under a contract or arrangement which is reasonable; and (3) no more than reasonable compensation is paid for such service." 29 C.F.R. § 2550.408b–2(a). In order to avoid the proscriptions of section 406(a)(1)(D), the defendant trustees must satisfy each of the three requirements of ERISA § 408(b)(2). Of the three provisions, the only one at issue in this case is that regarding "reasonable compensation."

16. The term "reasonable compensation", as set forth in section 408(b)(2), is defined in ERISA § 408(c)(2), 29 U.S.C. § 1108(c)(2), and the regulation issued thereunder, 29 CFR § 2550.408c–2. Section 408(c)(2) provides generally that nothing in ERISA § 406[4] shall prohibit a fiduciary from receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred.[5] Regulation 29 C.F.R. § 2550.408c–2 provides, in relevant part, that the term "reasonable compensation":

---

**2.** ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides as follows: "Except as provided in section 408: a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), defines "the party in interest" to include any fiduciary, including a trustee, of the plan.

**3.** Section 408(b)(2) exempts only violations of section 406(a), not violations of section 406(b). 29 C.F.R. § 2550.408b–2; *Gilliam v. Edwards, supra,* 492 F.Supp. at 1263; *Marshall v. Kelly, supra,* 465 F.Supp. at 353–354.

**4.** Like section 408(b)(2), the exemption provided by section 408(c)(2) applies only to violations of section 406(a), not to violations of

section 406(b). 29 C.F.R. § 2550.408c–2; *Gilliam v. Edwards, supra,* 492 F.Supp. at 1263.

**5.** Section 408(c)(2) states:

(c) Nothing in section 406 shall be construed to prohibit any fiduciary from

(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred.

does not include any compensation to a fiduciary who is already receiving full-time pay from an employer or association of employers (any of whose employees are participants in the plan) or from an employee organization (any of whose members are participants in the plan), except for the reimbursement of direct expenses properly and actually incurred and not otherwise reimbursed.

These trustee defendants, therefore, can meet the relevant exemptions provided by ERISA § 408(b)(2) and 408(c)(2) only if it can be shown that they were receiving less than "full-time pay" from their respective contributing unions and employers.

17. On a motion for summary judgment the Government has the burden of proving that the defendants are not entitled to the exemptive relief provided by section 408(b)(2) and 408(c)(2). The procedural posture of this case reverses the usual burden of proof: ordinarily it is the trustees who would bear the burden of proof at a trial. *Marshall v. Snyder, supra,* 572 F.2d 894, 900.

18. The provision prohibiting a fiduciary from receiving compensation from a plan when he already receives full-time pay from a participating employer or union resulted from Congressional concern with the potential for abuse by fiduciaries of employee benefit plans. As stated in the Joint Explanatory Statement of the Committee of Conference accompanying ERISA, at page 312, one of the reasons for inclusion of this provision was "to prevent double payment"—payment to the trustee from the plan and from a participating union or employer.

19. In construing the term full-time pay, the focus is "not on the hours devoted to the second job or function, but on the amount of payment received. [The] aim is to prevent double payment from a party in interest and thus avoid the conflicts dual allegiances may spark. A weekly salary of even $250 is sufficient to create an impermissible interest tension." *Gilliam v. Edwards, supra,* 492 F.Supp. at 1264 (citation omitted).[6]

## II. THE SECTION 406(a) VIOLATIONS

20. Based upon the facts set forth above, the Court holds that defendant Martin was receiving full-time pay from Martin Builders, Inc. during the period when this company was making contributions to and its employees were participating in the Plans. His salary alone from Martin Builders, Inc.—$41,600 in 1977; $37,100 in 1978; $37,935 in 1979; and $47,885 in 1980 was substantial and, by any reasonable standard, must be viewed as full-time pay within the meaning of ERISA § 408(c)(2). *Gilliam v. Edwards, supra.* Hence, his receipt of the monthly payments from the Plans, the contributions made on his behalf, and his receipt of benefits from the Plans each constitutes a form of non-exempt prohibited compensation in violation of ERISA § 406(a)(1)(D).

21. It is not necessary to look at *Gilliam* alone to conclude that Martin has been receiving full-time pay from Martin Builders, Inc. During the relevant time period, he has been the company's president and principal shareholder. In his own words, he has "run" Martin Builders, Inc.[7] and has received more income from it than anyone else. Under these circumstances, the Court is not persuaded that Martin's income from Martin Builders, Inc. was reduced by the relatively few hours he spent on trustee business each month. In fact, Martin flatly

---

6. The Department of Labor in a series of opinion letters issued between 1977 and 1980, has interpreted the § 408(c)(2) provisions in a manner consistent with the *Gilliam* case and the Congressional view of its meaning and purpose. The Court notes that "construction by the agency charged with the enforcement of ERISA (which) resolves inconsistencies in the statutory language and preserves a fundamental purpose of ERISA, i.e. to prevent a fiduciary from acting in matters in which he has an interest which might affect his judgment, should (be given) great weight, *Udall v. Tallman,* 380 U.S. 1 [85 S.Ct. 792, 13 L.Ed.2d 616] (1965)." *Marshall v. Kelly, supra,* 465 F.Supp. 341, 354.

7. Martin Dep. 26–28, Agreed Facts, Par. 24.

testified at his deposition that no such reduction ever occurred.[8]

22. Defendants rest part of their defense on the contention that Martin devoted only part of his working time to, and received only a minority of his income from, Martin Builders, Inc. Martin testified at his deposition that since 1975 he has spent approximately 50–60% of his 60-hour work week in carrying out his responsibilities for Martin Builders, Inc.[9] He devoted the remaining time to his other business enterprises which produced the majority of his income.[10] Defendants have suggested that these facts preclude a finding that Martin's compensation from Martin Builders, Inc. constituted "full-time pay" within the meaning of ERISA § 408(c)(2).

23. The Defendants' argument misperceives the entire thrust of and purpose underlying the full-time pay proscription. "ERISA focuses not on the hours devoted to the second job or function but on the amount of payment received." *Gilliam, supra,* 492 F.Supp. at 1264. This approach, which has also been advanced by the Labor Department in its interpretive role, most clearly fulfills Congressional aims and provides the only practicable standard for determining whether a fiduciary received "full-time pay."

24. A standard based on the number of hours worked, which the defendants advocate, would effectively annul the full-time pay proscription and provide the potential for the kind of abuse evidenced here. If the number of hours were the measure, a trustee could reduce his working hours for the contributing employer or union, but not his income, and then take home an additional sum from the plan. Congress expressly intended to prohibit this and other situations which can easily lead to abuse.

25. Similarly, a standard based on the percentage that the income from the participating employer or union bore to the trustee's total income would be inappropriate. Such a standard would not achieve the objective of Congress to focus on the income derived from a plan sponsor. Reference to income from other sources would only cloud that focus, and such a standard would not only interfere with pragmatic enforcement of the statute but would give rise to potential manipulation and evasion of the prohibition.

26. Based upon the facts set forth above, the Court holds that defendant Walton also was receiving full-time pay from the J.S. Walton, Co. from July 1, 1977 through June 30, 1980 and from J.S. Walton, Co., Inc. from July 1, 1980 through December 31, 1981. Hence, his receipt of the monthly payments from the Plans, the Plans' contributions on his behalf, and his receipt of benefits from the Plans each constitutes a form of non-exempt prohibited compensation in violation of ERISA § 406(a)(1)(D).

27. Defendant Walton's income from the two contributing employer entities was enormous and without question sufficient to constitute full-time pay. In 1977, his income from the partnership was $363,433; in 1978, $88,885; in 1979, $469,946 and in 1980, $239,051. In 1980, his income from the corporate entity was $36,000. As in *Gilliam,* these substantial sums are sufficient to constitute "full-time pay" within the meaning of ERISA § 408(c)(2).[11] As the managing partner of the partnership and president of the corporation, Walton's income from these entities has not been reduced in any documented manner by his activities as a trustee of the Plans.[12]

8. Martin Dep. 47–48.

9. Martin Dep. 35–36, Agreed Facts, Par. 25.

10. Martin's adjusted gross income as reported on his IRS Form 1040 for 1977 was $111,689; for 1978, $166,264; for 1979, $396,336; and for 1980, $316,386.

11. Walton testified at his deposition that he has devoted about 10–12 hours per week to J.S. Walton Co. and J.S. Walton Co., Inc. (Walton Dep. 35–36; Agreed Facts, Par. 18). For the reasons stated in connection with the discussion of defendant Martin, the Court does not view this fact as significant.

12. Defendants have argued that Walton's income from the J.S. Walton companies was reduced by his attendance to trustee business because the time Walton spent on such busi-

28. Based upon the facts set forth above, the Court holds that defendant Ernest also has been receiving full-time pay from the Ernest Construction Co. from July 1, 1977 to at least November 30, 1981, a period of time in which the employees of that company were participants in the Plans. Hence his receipt of the monthly payments from the Plans, the contributions made on his behalf by the Plans, and his receipt of benefits from the Plans each constitutes a form of prohibited compensation in violation of ERISA § 406(a)(1)(D).

29. Since July 1, 1977, defendant Ernest's income from the Ernest Construction Co. has been substantial and at times enormous. In 1977, it was $94,725; in 1978 and 1979, he received approximately $500 a week from the company; and in 1980, his income was $60,388. As in *Gilliam,* these substantial sums are sufficient to constitute full-time pay within the meaning of ERISA § 408(c)(2). Further, Ernest's income from the partnership has not been reduced in any documented manner by his activities on behalf of the Plans. Although defendants deem it significant that Ernest devoted approximately 60% of his 50 hour work week to Ernest Construction Co. business,[13] the fact is that, as the managing partner of his company, he was entitled to 51% of its profits. Based on these facts, the Court finds that Ernest's compensation was not reduced by the few hours a week he spent on trustee business.[14]

30. Based on the facts set forth above, the Court holds that defendant Lowe also has been receiving full-time pay from the International Union of Operating Engineers Local 653. Hence, his receipt of monthly payments from the Plans, the contributions made on his behalf by the Plans, and his receipt of benefits from the Plans each constitutes a form of prohibited compensation in violation of ERISA § 406(a)(1)(D).

31. In consideration of the services he has rendered to the Local, Lowe received a salary of $31,176 in 1977; $32,859 in 1978; $33,397 in 1979; and $32,986 in 1980. For each of the relevant years, then, Lowe's income has been substantial and, under *Gilliam,* sufficient to constitute full-time pay within the meaning of ERISA § 408(c)(2). As the highest paid official of the Local and its salaried business manager, this Court concludes that defendant Lowe has been receiving full-time pay.

32. Based on the facts set forth above, the Court holds that defendant Carroll Daugherty has also been in receipt of full-time pay from the Millwright and Machinery Erectors, Inc. Local 2734 and from J & J Construction Co. for the years 1978, 1979, and 1980. Hence, his receipt of his monthly salary from the Plans, the Plans' contributions made on his behalf, and his receipt of benefits from the Plans each constitutes a form of prohibited compensation from the Plans in violation of ERISA § 406(a)(1)(D).

33. For his services as business manager, Daugherty received a salary of $22,427 in 1978; $23,685 in 1979; and $23,760 in 1980. As noted above, from 1977 through 1980, Daugherty was associated with J & J Construction and Maintenance Contractors, Inc. (J & J) and received from this company $52,000 in compensation in 1978; $52,000 in 1979; and $25,000 in 1980. Thus, Daugherty's total income from the contributing employer and union was $74,427 in 1978; $75,685 in 1971; and $48,760 in 1980. Under

---

ness was time he could not spend on his other business affairs. The Court finds this argument wholly without merit. There is no evidence in the record which demonstrates any specific reduction in Walton's income as a direct result of his trustee activities.

**13.** Agreed Facts, Par. 11.

**14.** Like Walton, Ernest testified that the time spent on trustee business was time away from his other business and, therefore, had a detrimental effect on his income. However, other than one instance in which he claimed to have lost a job because of his failure to finish the paperwork necessary for obtaining a bond—a failure which he attributed to his attendance at a trustee meeting—Ernest could not cite any specific examples of the manner in which his compensation from Ernest Construction Co. was actually reduced by his trustee responsibilities. (See Ernest Dep. 58–70). The Court finds that the bond incident is far too speculative to be given any weight.

the *Gilliam* standard, each of these sums is substantial enough to constitute full-time pay. Even if considered separately, Daugherty's income from Local 2734, taken by itself, and his income from J & J, taken by itself, each were substantial enough to constitute full-time pay.

34. Defendants argue that Daugherty is only a "part-time" employee of the Local. To support that conclusion, defendants have referred the Court to a letter Daugherty has from the United Brotherhood of Carpenters and Joiners of America (the governing organization for his union) regarding his responsibilities as business manager of Local 2734. The letter states, in relevant part, that he has been authorized to provide "part-time" representation to the Local since at least 1975. Defendants also point to the fact that, although he is the only salaried official of Local 2734, Daugherty's salary has apparently been less than it would have been had he been providing greater representation, and he has devoted only a minority of his time to his duties as business manager.[15]

35. Daugherty's situation is, in many respects, similar to that of defendant Edwards in the *Gilliam* case. Like Edwards, Daugherty spent the early morning hours attending to his union business, and the bulk of the day on plan business as plan administrator. (*Gilliam,* 492 F.Supp. at 1258; Daugherty Dep. at 56–57.) Edwards had a contract with his plan which recognized him as a "part-time" employee of his union. *Gilliam, supra,* 492 F.Supp. at 1259. Just as the Court in *Gilliam* had no trouble in finding that Edwards' salary from the union constituted full-time pay under ERISA § 408(c)(2), the evidence here compels this Court to reach a similar decision, *a fortiori* because of Daugherty's added compensation from the contribution employer, J & J.

36. The Court notes that Daugherty's "part-time" position with Local 2734 had no relation whatsoever to his responsibilities as the Plans' administrator or trustee. In this regard, it was long before 1978, the year in which he became a trustee and the Plans' administrator, that Daugherty began working a reduced schedule because Local 2734 did not require him to work more.[16] Significantly, the duties which he performed for Local 2734 before 1978 are the same that he performed after 1978,[17] and his salary from Local 2734 has not been reduced by his responsibilities as administrator or trustee of the Plans.[18] Finally, the Court notes that the letter concerning Daugherty's representation of the Local was written on June 5, 1981, after the trustees had received a letter dated April 23, 1981 from the Department of Labor advising them of the Department's intent to sue. Thus, the Court finds that the self-serving characterization of Daugherty's work arrangement as "part time" is not entitled to much weight in deciding this issue.

37. Defendant Reeves has been retired since July 5, 1977 and has not received any compensation from a union or employer whose members or employees participate in the Plans since that time. These facts, however, do not insulate him from liability for the breaches at issue in this litigation. As shown above, on September 20, 1977, Reeves, along with all of the other trustees, resolved to authorize the Plans to begin making monthly payments to themselves retro-active to July 1, 1977. Thus, under the operative language of ERISA § 406(a), Reeves "caused the Plans to engage in a prohibited transaction," and he is, therefore, jointly and severally liable for the prohibited payments made to the other trustees.

38. One point needs emphasis. The interpretation of the term *full-time pay* in ERISA § 408(b)(2), (c)(2), is not self-evident. Nowhere in the statute is the term defined. The regulation issued by the Department of Labor on the subject is unclear.

**15.** Daugherty Dep. 56–57.

**16.** Daugherty Dep. 60–62.

**17.** Daugherty Dep. 84.

**18.** Daugherty Dep. 80–81.

*See* Fiduciary Responsibility Under ERISA, 29 C.F.R. § 2550.408c–2 (1981). Finally, the legislative history affords little insight into the intent of Congress. Only through case-by-case adjudication have the courts given flesh to the terms. In the case *sub judice* the attorney for the plan, Mr. Thomas Galloway, made every effort to research the meaning of the term *full-time pay* prior to rendering an opinion on the issue to the trustees. As it turns out, under the 20/20 vision of hindsight, the courts have disagreed with Mr. Galloway's interpretation. Mr. Galloway is not to be faulted for his interpretation. A lawyer he is, but a sorcerer he is not.

## III. SECTION 406(b) VIOLATIONS

39. The Court also concludes that the evidence demonstrates that the trustee defendants, except J.C. Reeves,[19] also violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1),[20] by authorizing for themselves the monthly payments and by authorizing the Plans to make contributions on their behalf so as to make themselves eligible to receive benefits from the Plans. As noted above in footnotes 2 and 3, there are no applicable exemptions to the § 406(b) violations.

## IV. THE SECTION 404 VIOLATIONS

*The Trustees*

40. The facts set forth above demonstrate that the trustees furthered their self-dealing conduct by improperly causing the Plans to extend coverage to themselves and defendant Galloway as participants in the Plans and to pay themselves and Galloway benefits from the Plans in violation of ERISA §§ 404(a)(1)(A) and (D).

41. Section 404(a)(1)(A) of the Act imposes upon the trustees a duty to carry out their fiduciary responsibilities solely in the interest of plan participants and beneficiaries and for the exclusive purpose of provid-

ing them benefits and defraying reasonable expenses of administering the plan. Under section 404(a)(1)(D), plan fiduciaries are required to carry out their responsibilities in accordance with the documents and instruments governing the plan.

42. As the facts set forth above show, the defendant trustees participate in and receive benefits from the Plans on a basis which favors them over the employees on whose behalf the Plans were created. Whereas individual, rank and file employees of the contractors are credited for participation and eligibility purposes with only the hours which they actually work for a given contractor, the trustees receive 40 hours of credited service regardless of the time which they actually put in. (Daugherty Dep. 124–129). Thus, their participation in and receipt of benefits from the Plans is essentially subsidized by the participants who must actually work a full hour in order to receive credit for one.

43. Defendants have attempted to defend their conduct by arguing that other persons allegedly participate in the Plans on the same basis as they do. In this regard, they point to the fact that contractor-owners have been participating in the Plans and each such person is credited with 40 hours of service per week regardless of the number of hours which he actually puts in. There is one essential difference, however, between the contractor's situation and that of the trustees' which the Court finds dispositive of this issue. With regard to a contractor, participation in the Plans is conditioned on his paying contributions for himself for a full 40 hour week, regardless of the time actually worked. (Daugherty Dep. 124–129). This system provides economic protection to the Plans because they receive contributions for such persons which at the very least equal those received on behalf of other participants. In contrast, it is the Plans (and thereby the participants

**19.** Because his own receipt of the monthly payment was not prohibited, Reeves is not liable under ERISA § 406(b)(1)—the self-dealing provision—and the Secretary of Labor has not alleged such a violation.

**20.** ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), provides as follows: "A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

and beneficiaries) which pay for the trustees' contributions. The Plans are injured because contributions which would otherwise be available for other purposes (such as providing benefits to the employees for whose benefit the Plans were established) must be allocated for the benefit of the trustees.[21] Such an arrangement is hardly consonant with the trustees obligations under ERISA § 404(a)(1)(A) to operate the Plans solely in the interest of the participants and beneficiaries and for the exclusive purposes of providing them benefits and defraying reasonable expenses of administering the Plans.[22]

### A. The Trustees' Participation in the Pension Plan

44. Participation in the Pension Plan is limited to "Active Participants" who are credited with a sufficient number of "Hours of Work." (Ex. 5, Art. III, § 3.1, p. 16; Art. II, § 2.1(e), pp. 14–15). In order to be an "Active Participant," a person must be an "Employee." (Ex. 5, Art. II, § 2.1(b)). An "Employee" is defined as:

Every person whose employment with an Employer is covered by the terms of collective bargaining agreements between the Union and the various Employers comprising the Mobile Chapter, Associated General Contractors of America, Inc. Such term shall also include bonafide representatives of Employees of the Union, provided the Union is making the required Employer contributions on behalf of such bonafide representatives or Employees.

(Ex. 5, Art. II, § 2.1(h), p. 15)

45. The Pension Plan documents made it clear that none of the trustees or defendant Galloway is a proper participant. The employer trustees can hardly claim that they are Employees under the definition quoted above. The same is true for defendant Galloway. (See Daugherty Dep. 144). With respect to the Union trustees, the Plan specifically contemplates that they may participate but only if their Unions make the necessary contributions.

46. Based on these facts, the trustees' decision to allow themselves and defendant Galloway to participate in the Plans and to cause the Plans to make contributions on their behalf and on behalf of defendant Galloway violated ERISA § 404(a)(1)(D).

### B. The Trustees' Participation in the Welfare Plan

47. Like the Pension Plan, the Welfare Plan clearly contemplates limiting participation to "Employees" of "Employers." Again, the employer trustees and Galloway can hardly claim to be employees of an Employer. With respect to the Union trustees, the Plan document again makes provision for their participation, but only if the Union makes the contribution.

48. The trustees' decision to allow themselves to participate in the Welfare Plan, therefore, also violated ERISA § 404(a)(1)(D).

### C. Thomas Galloway

49. The facts presented above demonstrate that Thomas Galloway, the Plans' attorney during the entire period relevant to this lawsuit, knowingly participated in the decision of the trustees to extend coverage to him as a participant in the Plans and to pay him benefits from the

---

21. Defendants have argued that there is no loss to the Plans because, in effecting the contributions on behalf of the defendants, the Plans simply transfer employer contributions from one account to another. (Agreed Facts, Par. 60(a)). A violation of ERISA § 404(a) is not dependent on a finding of a monetary loss. *Donovan v. Mazzola, supra,* (N.D.Cal.1981) Moreover, each of the defendants has received benefits from the Welfare Plan, and the payment of such benefits constitutes a monetary loss to that Plan.

22. ERISA contemplates that a plan fiduciary may participate in and receive benefits from a plan, but this is permitted only "so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries." *See* ERISA § 408(c)(1), 29 U.S.C. § 1108(c)(1). For the reasons set forth in the text, the Court concludes that benefits for the trustees have not been computed and paid on the same basis as those provided for the other participants and beneficiaries.

Plans. In fact, Galloway advised the trustees that his participation in the Plans would be proper. Under such circumstances, although the Secretary of Labor does not allege that Galloway was a fiduciary with respect to the Plan, he is liable for the consequences of the trustees' breaches, at least to the extent he was personally enriched, and this Court so holds. Nonfiduciaries are accountable for breaches of fiduciary duty which they help promote. As the court noted in *Freund v. Marshall & Ilsley Bank, supra,* 485 F.Supp. at 642:

> [U]nder traditional principles of trust law a third party who assisted a trustee in committing a breach of trust could be held liable in an action brought by the beneficiaries. Moreover, the trustee and the third party could be joined in a suit for the recovery of the value of the trust property lost on account of the breach. (Citations omitted.)

Thus, Galloway, as attorney for the Plan, is liable for the breaches of fiduciary duty which he helped to promote.

## V. RELIEF

50. The Court will enter a separate Final Order and Judgment setting forth the appropriate relief.